Docket No. 104983.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

CONNIE MIKOLAJCZYK, Indiv. and as Special Adm'r of the Estate of James Mikolajczyk, Deceased, Appellee, v. FORD MOTOR COMPANY *et al.*, Appellants.

*Opinion filed October 17, 2008.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Freeman, Thomas, Karmeier, and Burke concurred in the judgment and opinion.

Chief Justice Fitzgerald concurred in part and dissented in part, with opinion.

Chief Justice Fitzgerald dissented upon denial of rehearing, with opinion.

Justice Kilbride took no part in the decision.

## OPINION

James Mikolajczyk died of injuries sustained when the Ford Escort he was driving was struck from behind by another vehicle. His widow, as special administrator of his estate, sued the other driver, claiming negligence, and Ford Motor Company and Mazda Motor Corporation, claiming defective design of the driver's seat. Summary judgment was entered against the other driver. The claims against the

other two defendants proceeded to a jury trial in the circuit court of Cook County. The jury found defendants liable and awarded plaintiff $2 million in damages for loss of money, goods, and services, and $25 million for loss of society.

The appellate court affirmed in part and reversed in part. *Mikolajczyk v. Ford Motor Co.*, 369 Ill. App. 3d 78 (2006). This court denied defendants' petition for leave to appeal, but remanded the matter to the appellate court with instructions to reconsider in light of *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247 (2007). On remand, the appellate court again affirmed in part and reversed in part, finding the damages awarded for loss of society to be excessive and remanding to the circuit court for a hearing on the proper amount of *remittitur*. 374 Ill. App. 3d 646. This court granted defendants' petition for leave to appeal pursuant to Supreme Court Rule 315 (210 Ill. 2d R. 315) to determine whether the trial court erred by instructing the jury on the consumer-expectation test and rejecting defendants' tendered instruction on the risk-utility test for defective design. In addition, we allowed plaintiff's petition to seek cross-relief on the damages issue.

We have permitted the Products Liability Advisory Council, Inc., the Illinois Manufacturers' Association and the National Association of Manufacturers, the Illinois Association of Defense Trial Counsel, and the Alliance of Automobile Manufacturers, Inc., to file briefs *amici curiae* on behalf of the defendants. We have also permitted the Illinois Trial Lawyers Association to file a brief *amicus curiae* on behalf of the plaintiff. 210 Ill. 2d R. 345.

## BACKGROUND

On February 4, 2000, William Timberlake shared two pints of gin with a friend before getting behind the wheel of his Cadillac. He was traveling approximately 60 miles per hour when he smashed into the rear of a 1996 Ford Escort that was stopped at a red light. The driver of the Escort, James Mikolajczyk, suffered severe, irreversible brain trauma and spent several days on life support before his death. His daughter, Elizabeth, then aged 10, who was asleep in the backseat at the time of the accident, suffered two broken legs. James was also survived by his wife, Connie, and son, Adam, then aged 14.

Plaintiff's negligence suit against defendant Timberlake resulted in the entry of summary judgment. Plaintiff's lawsuit against defendants Ford and Mazda alleged strict product liability premised on defective design of the driver's seat of the Escort. Specifically, she claimed that as a result of the defective design of the seat, it collapsed when the car was struck from behind, causing James to be propelled rearward and to strike his head on the backseat of the car. Plaintiff further alleged that the design of the seat was unreasonably dangerous and that the design defect proximately caused James's death. The Escort was manufactured by defendant Ford. The seat was designed by defendant Mazda; Ford had the authority to approve or disapprove the design.

The trial testimony is summarized in detail in the appellate court opinion. 374 Ill. App. 3d at 650-53. For purposes of this appeal, it is necessary to note only that the evidence included testimony by expert witnesses for both parties regarding the risks and benefits posed by the "yielding" seat (referred to as the CT20 design), its compliance with federal safety requirements, the availability and feasibility of a rigid seat, the risks and benefits posed by the rigid seat design, and the seat designs employed in other makes and models of cars manufactured in 1996.

The trial court instructed the jury using plaintiff's tendered versions of Illinois Pattern Jury Instructions, Civil, Nos. 400.01.01 (setting out the plaintiff's claim of defective design and the defendants' denials), 400.02 (setting out the plaintiff's burden of proof and the elements of a claim for strict liability), and 400.06 (defining the expression "unreasonably dangerous"). Illinois Pattern Jury Instructions, Civil, Nos. 400.01.01, 400.02, 400.06 (2006) (hereinafter IPI Civil (2006)). The trial court rejected defendants' tendered nonpattern jury instructions that would have specifically instructed the jury to consider the "overall safety" of the design, whether the foreseeable risks of harm of the design outweighed its benefits, and whether the adoption of a feasible alternative design would have avoided or reduced the risks. Defendants argued unsuccessfully that this instruction should be given either instead of or in addition to instruction 400.06.

The jury answered the following special interrogatory in the affirmative: "Was the driver's seat of the Mikolajczyk car in an

unreasonably dangerous condition that was a proximate cause of James Mikolajczyk's death?" The jury then returned a verdict in favor of the plaintiff and awarded $2 million in damages for loss of money, goods, and services and $25 million for loss of society. The jury assigned 60% of fault to Timberlake and 40% to Ford and Mazda.

The appellate court rejected defendants' argument that the jury was improperly instructed, but reversed the judgment in part, finding the $25 million award for loss of society excessive. 374 Ill. App. 3d at 674.

Before this court, defendants argue that the appellate court "turned back the evolution of Illinois law" by applying the "outdated" consumer-expectation test rather than the risk-utility test that, they assert, is now the exclusive test for defective design of a complex product. In the alternative, they argue that even if this court has not expressly adopted risk-utility as the exclusive test in such cases, it should do so now. In effect, they argue that the trial court applied the wrong substantive law to plaintiff's claim, raising this issue in the context of the trial court's refusal to give their non-IPI jury instruction. Defendants also argue that a new trial must be granted in any event because the jury instructions that were given did not correspond to the evidence presented at trial.

Plaintiff argues that the appellate court erred by finding the $25 million award for loss of society excessive and remanding for a new hearing on defendants' motion for *remittitur*.


ANALYSIS

Neither the first edition (1961) nor the second edition (1971) of the Illinois Pattern Jury Instructions, Civil, contained instructions dealing with claims of strict product liability. The 400.00 series of instructions, which deals with strict product liability, was adopted in 1977 in a supplement to the second edition. See IPI Civil (2006), at xiii-xiv (foreward to the third edition). The third edition, which was adopted in 1992, retained instruction 400.06 without change, as have subsequent editions in 1995, 1997, 2000, and 2006. Pattern jury instruction 400.06 defines the term "unreasonably dangerous" in the context of a strict product liability claim:

"When I use the expression 'unreasonably dangerous' in these instructions, I mean unsafe when put to a use that is reasonably foreseeable considering the nature and function of the [product]." IPI Civil (2006) No. 400.06.

The comment following this instruction observes that the "expression 'unreasonably dangerous' first found acceptance in Illinois in *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 210 N.E.2d 182 (1965)."[1] IPI Civil (2006) No. 400.06, Comment, at 562. In *Suvada*, this court recognized a cause of action for strict liability in tort against the manufacturer of a product whose defective condition made it unreasonably dangerous to the user or consumer. This court noted that its conclusion "coincide[d] with the position taken in section 402A of the American Law Institute's revised Restatement of the Law of Torts," which had recently been approved. *Suvada*, 32 Ill. 2d at 621. This section provides, in part, that:

"One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property ***." Restatement (Second) of Torts §402A (1965).

The drafters of the pattern jury instruction explained that they chose the phrase "unreasonably dangerous condition" instead of the words "defect" or "defective condition" because the phrase "is more conversational and is less likely to suggest traditional concepts of fault to the jurors." The drafters noted, further, that an instruction defining "unreasonably dangerous" is needed "because the concept is not generally understood by, nor within the common experience of, jurors." Under this instruction, "a product can be 'unreasonably dangerous' only when put to a use that is reasonably foreseeable." IPI Civil (2006) No. 400.06, Comment, at 563.

It has since been well established that to recover in a strict product liability action, a plaintiff must plead and prove that the injury

---

[1] *Suvada* was impliedly overruled on other grounds in *Frazer v. A.F. Munsterman, Inc.*, 123 Ill. 2d 245 (1988). The implied overruling of *Suvada* was recognized by this court in *Dixon v. Chicago & North Western Transportation Co.*, 151 Ill. 2d 108, 123 (1992).

complained of resulted from a condition of the product, that the condition was unreasonably dangerous, and that it existed at the time the product left the manufacturer's control. *Sollami v. Eaton*, 201 Ill. 2d 1, 7 (2002). A product may be found to be unreasonably dangerous based on proof of any one of three conditions: a physical defect in the product itself, a defect in the product's design, or a failure of the manufacturer to warn of the danger or to instruct on the proper use of the product. *Sollami*, 201 Ill. 2d at 7.

As early as 1979, this court held that when a strict liability claim is based on an alleged design defect, the product may be proven to be unreasonably dangerous "by evidence of the availability and feasibility of alternate designs at the time of its manufacture, or that the design used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or governmental regulation." *Anderson v. Hyster Co.*, 74 Ill. 2d 364, 368 (1979).

That same year, this court held that a product may be found unreasonably dangerous based on a design defect if the plaintiff presents evidence of an alternative design that is "economical, practical and effective." *Kerns v. Engelke*, 76 Ill. 2d 154, 162-63 (1979). Such evidence introduces the question of feasibility, " 'since a manufacturer's product can hardly be faulted if safer alternatives are not feasible.' " *Kerns*, 76 Ill. 2d at 163, quoting *Sutkowski v. Universal Marion Corp.*, 5 Ill. App. 3d 313, 319 (1972). Because the evidence and the court's instructions were sufficient for the jury to find for the plaintiff in *Kerns*, this court did not determine whether a plaintiff claiming design defect *must* plead and prove that a feasible alternative design is available. *Kerns*, 76 Ill. 2d at 163-64.

In *Lamkin v. Towner*, 138 Ill. 2d 510, 528 (1990), this court reiterated its earlier adoption of section 402A of the Restatement (Second) of Torts, observing that a product is "unreasonably dangerous" due to a defect in either manufacturing or design when it is " 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' " *Lamkin*, 138 Ill. 2d at 528, quoting Restatement (Second) of Torts §402A, Comment *i*, at 352 (1965).

We further stated that in a strict product liability action, a claim of defective design may be proven in either of two ways. First, the plaintiff may introduce "evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Lamkin*, 138 Ill. 2d at 529. This has come to be known as the consumer-expectation test. Second, the plaintiff may introduce "evidence that the product's design proximately caused his injury." If the defendant thereafter "fails to prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs," the plaintiff will prevail. *Lamkin*, 138 Ill. 2d at 529. This test, which added the balancing of risks and benefits to the alternative design and feasibility inquiries adopted in *Anderson* and *Kerns*, has come to be known as the risk-utility or risk-benefit test.

The product at issue in *Lamkin* was a window screen. The plaintiffs were parents of two children who were injured when they fell from apartment windows. The trial court denied the defendants' motions for summary judgment and certified four questions for interlocutory appeal. *Lamkin*, 138 Ill. 2d at 516-17. On the question of the plaintiffs' claims of strict liability for defective design, this court applied both the consumer-expectation test and the risk-utility test to the evidentiary materials in the record and determined that the trial court's denial of the motion for summary judgment was improper because plaintiffs could not have met either test. *Lamkin*, 138 Ill. 2d at 529-31.

Specifically, under the consumer-expectation test, the question was whether "the window screens failed to perform as safely as an ordinary consumer would expect when *used* in an intended or reasonably foreseeable manner." (Emphasis in original.) *Lamkin*, 138 Ill. 2d at 529. Because window screens are designed for ventilation and to prevent insects from entering, not to prevent an individual from falling, the window screen did what it was designed to do without unreasonable danger. The danger arose only when the window screen did not do something it was not designed to do. The ordinary person, with ordinary knowledge, would appreciate this distinction. *Lamkin*, 138 Ill. 2d at 529-30.

Applying the risk-utility test, this court considered whether there was evidence of how the "window screens' *design* proximately

caused" the children's injuries. (Emphasis in original.) *Lamkin*, 138 Ill. 2d at 530. This court asked whether the plaintiff had provided "evidence of how the window screens' design could have been altered to create a safer screen *** or any evidence of the form and feasibility of the alternative screen design." *Lamkin*, 138 Ill. 2d at 530. Finding no evidence to support the plaintiffs' allegations, this court found, as a matter of law, that the window screens were not " 'defective or unreasonably dangerous' such as to serve as the basis for a products liability action." *Lamkin*, 138 Ill. 2d at 530-31.

Notably, in *Lamkin*, when applying the consumer-expectation test, this court focused on the manner in which the allegedly dangerous product was being used. When applying the risk-utility test, this court focused on the availability and feasibility of alternative designs for the product. IPI Civil (2006) No. 400.06, which was given in the present case, also focuses on the use to which the allegedly defective product was being put, thus stating, at least in part, the content of the consumer-expectation test. The instruction, however, does not include any content specific to the risk-utility test.

(1)

Defendants argue that this court's decisions subsequent to *Lamkin*, specifically *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420 (2002), *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78 (2005), and *Calles*, 224 Ill. 2d 247, have established that in a product liability action predicated on a claim of defective design, the risk-utility test is the *only* proper test. If this court's precedents do not establish this definitive rule, they argue, our decisions have nevertheless established that the risk-utility test is the only test to be applied if the product at issue is complex and if the injury occurred in circumstances unfamiliar to the average consumer. Thus, defendants argue, even if the consumer-expectation test might still be applicable in some design defect cases, it is "reserved" for cases involving simple products or everyday circumstances. They argue, further, that despite this development in the law of strict product liability, the existing pattern jury instruction misinforms the jury by not setting out the applicable test.

The defendants frame the question for this court as whether the existing jury instruction accurately states the law, subject to *de novo* review, citing *People v. Parker*, 223 Ill. 2d 494, 501 (2006). Plaintiff argues for application of the abuse of discretion standard, under which reversal is not appropriate for giving a faulty instruction or refusing to give a tendered instruction absent a showing of prejudice to party's right to a fair trial. *McCarthy v. Kunicki*, 355 Ill. App. 3d 957, 970 (2005). Defendants reply that even if this court were to apply the abuse of discretion standard, it was an abuse of discretion requiring a new trial for the trial court to give an outdated, inapplicable instruction on a key issue, citing *Eshoo v. Chicago Transit Authority*, 309 Ill. App. 3d 831, 836-37 (1999). We agree with defendants that the question presented at this stage of our analysis is a question of law because it asks whether, as a matter of substantive law, this court has abandoned or limited the application of the consumer-expectation test in design defect cases and replaced it with the risk-utility test. Our review is, therefore, *de novo*.

We first used the expression "risk-utility" in *Hansen*, 198 Ill. 2d at 428, where the unintentional disconnection of an intravenous catheter connecting device had caused a fatal air embolism. The plaintiff claimed that the manufacturer failed to warn users of the device of the likelihood of unintentional disconnection and also that the device was unreasonably dangerous due to a design defect. *Hansen*, 198 Ill. 2d at 423-24. The jury rendered a general verdict, finding the defendant liable. The appellate court found that the general verdict could not be sustained on the failure-to-warn theory, but that the evidence justified a finding of design defect under either the consumer-expectation test or the risk-utility test. *Hansen v. Baxter Healthcare Corp.*, 309 Ill. App. 3d 869 (1999). The defendant manufacturer argued on appeal to this court that the appellate court erred by applying risk-utility analysis. *Hansen*, 198 Ill. 2d at 428. The defendant argued for application of only the consumer-expectation test, but claimed that the relevant expectations were those of health-care professionals, not patients, and that the ordinary professional consumer of this product would not have found it more dangerous than expected. *Hansen*, 198 Ill. 2d at 433-34.

This court first addressed the failure to warn claim and found, contrary to the appellate court's holding, that the defendant had a duty

to warn physicians and other health-care professionals who might use the device of its "known dangerous propensities" and that the jury's general verdict could reasonably have been based on a finding that the defendant had not fulfilled that duty. *Hansen*, 198 Ill. 2d at 430-32.

This court then turned to the design defect claim. We must note, however, that this court's holding on the failure to warn claim would have been a sufficient basis to affirm the trial court judgment. Arguably, it was not necessary for this court to reach the design defect claim, even though the defendant's petition for leave to appeal had been granted to review the appellate court's ruling on this issue. Whether this renders the remainder of the decision *dictum* is open to debate, but if *dictum*, it is judicial *dictum*. *Hawes v. Luhr Brothers, Inc.*, 212 Ill. 2d 93, 100 (2004) (supreme court's unnecessary pronouncement on an issue briefed and argued by the parties is "judicial *dicta*," rather than mere "*obiter dicta*" and should be given dispositive weight by the lower courts).

Considering the consumer-expectation test, this court concluded that the ordinary-consumer-expectation test, rather than the ordinary-physician-expectation test, applied to the design defect claim because the patient "was the person who would be harmed if the device failed" and because she "could have reasonably expected that her IV catheter connection, if properly designed and manufactured, would be safe to use for its intended purpose." *Hansen*, 198 Ill. 2d at 435. The evidence at trial was sufficient to establish that the design of the device was defective under this test. Thus, the appellate court was correct that the jury's decision was not against the manifest weight of the evidence. *Hansen*, 198 Ill. 2d at 435. Again, our analysis could have stopped here, but we went on to consider whether the evidence supported the verdict under the risk-utility test.

The defendant in *Hansen* argued that the risk-utility test was not appropriately applied to the medical device because it was simple and its risks were well known to the medical community. *Hansen*, 198 Ill. 2d at 436. The defendant relied on *Scoby v. Vulcan-Hart Corp.*, 211 Ill. App. 3d 106 (1991), in which the appellate court had rejected application of the risk-utility test to a claim that a deep-fat fryer used in a restaurant was defectively designed because it lacked a cover, stating:

"Somewhere, a line must be drawn beyond which the danger-utility test cannot be applied. Considering not only the obvious nature of any danger here but, also, the simple nature of the mechanism involved, we conclude that the circuit court properly applied only the consumer-user contemplation test." *Scoby*, 211 Ill. App. 3d at 112.

This court neither rejected nor adopted the principle set out in *Scoby*, but found that even if such a principle applied, it would not have affected the outcome in *Hansen*. First, such a conclusion was "not compelled by the facts" related to the medical device, which, unlike the deep-fat fryer, had been developed and marketed as a safety device. Second, this court found that, unlike the deep-fat fryer, the danger presented by the medical device was "not obvious, nor was the mechanism simple." *Hansen*, 198 Ill. 2d at 437. Thus, this court concluded that evidence of the existence of an alternative, safer design for the medical device was properly admitted and that the record was "sufficient to sustain a finding of unreasonable dangerousness under a risk-utility analysis." *Hansen*, 198 Ill. 2d at 436.

We also declined the defendant's invitation to adopt a new test for design defects in medical devices and prescription drugs under section 6 of the then-new Restatement (Third) of Torts: Products Liability (1998) (hereinafter Products Liability Restatement), finding the argument forfeited. We did, however, leave open the possibility of considering the adoption of sections of the Products Liability Restatement in the proper case. *Hansen*, 198 Ill. 2d at 438.

No issue was raised in *Hansen* regarding jury instructions. Both tests were applied by this court in the context of determining whether the evidence in the record supported the jury's general verdict.

Thus, by 2002, our case law had established that strict liability may be imposed based on proof of injury proximately caused by an unreasonably dangerous condition of a product and that such a condition may consist of a manufacturing defect, a design defect, or inadequate warnings. We had further established that a product's design may be found to be unreasonably dangerous and, thus, defective under either the consumer-expectation test or the risk-utility test. *Lamkin*, 138 Ill. 2d at 528-29. We had not limited the application of either test to a specific class of products. We had concluded that a

"complex" product, such as a medical device, may be subjected to both tests, but we did not define "complex" except to distinguish an IV catheter connector from a deep-fat fryer. *Hansen*, 198 Ill. 2d at 437. The pattern jury instruction defining "unreasonably dangerous," which had been adopted in 1977, many years prior to our decisions in *Lamkin* and *Hansen*, remained unchanged despite our adoption of two alternative methods of proving that a product is defectively designed because it presents an unreasonable danger.

We next considered the risk-utility test in 2005 in *Blue*. The product at issue was a trash compactor. The plaintiff pleaded both negligence and strict product liability based on design defect, but was forced to proceed solely on the negligence theory after the strict liability count was dismissed because it was filed beyond the limits of the statute of repose. *Blue*, 215 Ill. 2d at 81. The issue presented to this court was whether the trial court erred by giving the jury a special interrogatory, over plaintiff's objection, asking whether "the risk of injury by sticking a foot over or through a gate into a moving compactor [was] open and obvious." See *Blue*, 215 Ill. 2d at 85. The jury answered this question in the affirmative, but nevertheless returned a general verdict for the plaintiff. The trial court granted the defendants' posttrial motion for judgment *n.o.v.* on the basis that the jury's answer to the special interrogatory was inconsistent with the general verdict.

The appellate court reversed, noting that in a negligence action based on breach of a duty to warn, no such duty exists when the danger is open and obvious. *Blue*, 215 Ill. 2d at 86. The appellate court also held, however, that an open and obvious risk is not an absolute bar to liability in an action for negligent design, citing *Wortel v. Somerset Industries, Inc.*, 331 Ill. App. 3d 895, 902-03 (2002) (open and obvious danger does not necessarily bar recovery in a strict product liability case based on defective design; under the risk-utility test, the open and obvious nature of the risk posed by the product is merely a factor to be considered in the overall assessment of its risks and utility). *Blue v. Environmental Engineering, Inc.*, 345 Ill. App. 3d 455, 468 (2003).

After a discussion of the risk-utility test and its similarity to the negligence standard, a plurality of this court concluded that the risk-utility test, which would have been applicable to the dismissed strict

liability claims, did not apply to the claim of negligent design. *Blue*, 215 Ill. 2d at 97-98.

Defendant argues that in *Blue*, this court embraced section 2 of the Products Liability Restatement, which states:

> "A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:
>
> (a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product:
>
> (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;
>
> (c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe." Restatement (Third) of Torts: Products Liability §2, at 14 (1998).

The first sentence of this section parallels this court's language in *Lamkin*, recognizing three separate bases for strict product liability. Paragraph (a) sets out a test for defective manufacturing; paragraph (b) applies the risk-utility test to claims of defective design; and paragraph (c) sets out a test for inadequate instructions or warnings. Our "adoption" of this section of the Products Liability Restatement, according to defendants, means that use of the consumer-expectation test is now "restricted" to claims of manufacturing defect and that the risk-utility test alone applies to all claims of defective design.

-13-

Defendants argue further that even though *Blue* was a negligence case, not a strict liability case, the appellate court in the present case erred by treating our discussion of section 2 as mere *dicta*. Even though *Blue* was a plurality opinion, defendants assert that none of the concurring justices questioned whether the risk-utility test governs strict liability design defect cases and that two concurring justices suggested expanding the risk-utility test to cover negligent design claims as well. *Blue*, 215 Ill. 2d at 119 (Fitzgerald, J., specially concurring, joined by McMorrow, C.J.). They argue further that a "fair reading" of *Blue* suggests that it was "a signpost along the way to the law's current place, the risk-utility test."

We disagree. We did cite section 2 of the Products Liability Restatement in *Blue*, but only in the context of distinguishing negligent design claims from strict product liability defective design claims. *Blue*, 215 Ill. 2d at 93-94. We noted that this section was drafted in response to the recognized "inadequacy of section 402A to address claims of defective design and defects based on inadequate instructions and warnings." *Blue*, 215 Ill. 2d at 93. We did not, however, expressly or impliedly adopt section 2(b) as the sole, exclusive test for dangerousness in strict liability design defect cases. The most that can be said regarding *Blue* is that a plurality of this court noted the American Law Institute's observation that "the same rationale for imposing strict liability in manufacturing defect cases does not apply to design defects." *Blue*, 215 Ill. 2d at 94, citing Restatement (Third) of Torts: Products Liability §2, Comment *a*, at 16 (1998).

The *Blue* plurality went on to consider whether, under the risk-utility test, once the plaintiff shows that a design defect proximately caused his injury, the burden of proof shifts to the defendant to prove that the benefits of the design outweigh its inherent danger. *Blue*, 215 Ill. 2d at 98-99. This burden-shifting formulation of the risk-utility test comes from *Lamkin* (138 Ill. 2d at 529), but was not a part of the holding in that case. In fact, the holding in *Lamkin* negates any such burden on the defendant, because this court found that summary judgment for the defendant in that case was proper. If the burden had shifted to the defendant, summary judgment could not have been entered in the defendant's favor. *Blue*, 215 Ill. 2d at 99.

The burden-shifting formulation emanates from a citation to *Barker v. Lull Engineering Co.*, 20 Cal. 3d 413, 429-30, 573 P.2d 443, 453-54, 143 Cal. Rptr. 225, 235-36 (1978), widely recognized as the seminal case on risk-utility. This court cited *Barker* in *Palmer v. Avco Distributing Corp.*, 82 Ill. 2d 211, 219-20 (1980), and then cited both *Palmer* and *Barker* in *Lamkin* (138 Ill. 2d at 529), but no decision of this court has expressly adopted this burden-shifting formulation of the risk-utility test.

Having already concluded that the risk-utility test did not apply to the plaintiff's negligent design claim, it was not necessary for us to reach this question in *Blue*. We addressed it "only because of the appellate court's finding that the risk-utility test applied" to the negligence claim in that case. *Blue*, 215 Ill. 2d at 98. The plurality cited, with approval, a comment to section 2 of the Products Liability Restatement, which states that a plaintiff must establish a *prima facie* case of design defect by introducing evidence of a technologically feasible and practical alternative design that would have reduced or prevented the harm. Restatement (Third) of Torts: Products Liability §2, Comment *f*, at 23-24 (1998). Once that showing is made, the issue of liability is "one for the trier of fact to resolve." *Blue*, 215 Ill. 2d at 100.

With respect to the issues in the present case, the plurality opinion in *Blue* did not abandon or limit use of the consumer-expectation test. *Blue* signals only that this court is aware of the potential shortcomings of using the consumer-expectation test in design defect cases. The plurality in *Blue* also rejected a burden-shifting element of the risk-utility test, a conclusion that none of the concurring justices questioned.

Ultimately, defendants rely on this court's decision in *Calles* to argue that risk-utility is now the sole, exclusive test to determine whether an allegedly defectively designed product is unreasonably dangerous.

The product at issue in *Calles* was a utility lighter. The plaintiff was the mother of a three-year-old who died of smoke inhalation after her twin sister started a fire with the lighter. The plaintiff made both negligence and strict liability claims. *Calles*, 224 Ill. 2d at 251. The trial court granted summary judgment for the defendants.

The appellate court noted the *Blue* plurality's citation to *Scoby* "as authority that some simple products present such obvious dangers that the court need not apply the risk-utility balancing test." *Calles v. Scripto-Tokai Corp.*, 358 Ill. App. 3d 975, 982 (2005). Under this reasoning, the appellate court concluded, if a product is simple and its danger obvious, summary judgment for the defendant manufacturer is warranted if "the balance of all considerations so clearly favors the defendant that no reasonable jury could find for the plaintiff." *Calles*, 358 Ill. App. 3d at 983. Reversing in part, the appellate court held that the lighter did "not qualify as the kind of especially simple device for which the result of the risk-utility balancing is too obvious for trial." *Calles*, 358 Ill. App. 3d at 983.

The issue presented to this court in *Calles* was whether we had established, in *Blue*, a "simple product exception" to application of the risk-utility test in strict liability defective design cases. Specifically, the question was formulated as whether a product that is deemed "simple," with open and obvious dangers, was *per se* exempt from the risk-utility test. *Calles*, 224 Ill. 2d at 250.

We noted, again, that the consumer-expectation test was developed in the context of claims of manufacturing defects, but that it came to be applied to design defect claims as well. *Calles*, 224 Ill. 2d at 254-55. We acknowledged that the applicability of the consumer-expectation test to alleged design defects had been questioned and that the risk-utility test had been devised to respond to these concerns. *Calles*, 224 Ill. 2d at 255. We did not, however, state that the consumer-expectation test no longer applies in design defect cases. Indeed, we applied both tests in our analysis of the utility lighter after observing that "[s]ince *Lamkin*, this court has continued to employ these two tests when determining whether a product is unreasonably dangerous." *Calles*, 224 Ill. 2d at 256.

We observed that while a product might satisfy ordinary consumer expectations, its design could still be found defective using risk-utility analysis. *Calles*, 224 Ill. 2d at 256. Thus, the plaintiff in a design defect case whose claim failed the consumer-expectation test could nevertheless prevail under the risk-utility test.

The utility lighter at issue in *Calles* met the expectations of the ordinary adult consumer because it produced a flame when used as intended. The lighter, however, had not been used in its intended

manner; it had been used by a three-year-old child to start a fatal fire. This use, while tragic, was reasonably foreseeable. Because the lighter produced a flame when used in a reasonably foreseeable manner, thus fulfilling the expectations of the ordinary consumer, it could not, as a matter of law, be found unreasonably dangerous under the consumer-expectation test. *Calles*, 224 Ill. 2d at 258-59.

We then turned to the risk-utility analysis because it might still have been possible for the plaintiff to prevail under that test. Our first step was to address the defendant's reliance on *Scoby* for the proposition that there is a "simple product" exception to the risk-utility test that applies when the mechanism is so simple and the danger so obvious that it is proper to apply only the consumer-expectation test, citing *Scoby*, 211 Ill. App. 3d at 112. The defendant argued that the utility lighter, like the deep-fat fryer at issue in *Scoby*, was such a product and that, therefore, the risk-utility test should not be utilized.

We examined *Scoby* and concluded that the exception to risk-utility analysis that it espoused contained two separate components: the product must be "simple" and its danger must be "open and obvious." We disagreed with this formulation, finding that "the dangers associated with a product that is deemed 'simple' are, by their very nature, open and obvious." *Calles*, 224 Ill. 2d at 261. This is certainly true of the danger of being burned by boiling oil in a deep-fat fryer or the danger of starting a fire with a utility lighter. Thus, we concluded, the purported simple-product exception is "nothing more than the adoption of a general rule that a manufacturer will not be liable for open and obvious dangers." *Calles*, 224 Ill. 2d at 261.

After further analysis, we rejected such a *per se* rule exempting products with open and obvious dangers from risk-utility analysis. Instead, we concluded, the open and obvious danger of a product is but one factor to be considered when applying the risk-utility test. *Calles*, 224 Ill. 2d at 262. Our application of the risk-utility test to the evidence of record resulted in our conclusion that there was a disputed issue of material fact that precluded the entry of summary judgment in the defendant's favor. *Calles*, 224 Ill. 2d at 268-69.

In the end, *Calles* rejected the premise that in a certain category of strict liability cases, only the consumer-expectation test applies. *Calles*, 224 Ill. 2d at 263. Defendants argue that as a result, *Calles* has

rendered the consumer-expectation test "largely superfluous," because "the law is now clear: the risk-utility test applies to the design of *all* products, even simple products with open and obvious dangers." Defendants base this argument primarily on our citation in *Calles* to the decision of the Supreme Court of California in *Soule v. General Motors Corp.*, 8 Cal. 4th 548, 882 P.2d 298, 34 Cal. Rptr. 2d 607 (1994). *Calles*, 224 Ill. 2d at 256.

We had previously cited *Barker*, another California case, in *Lamkin* for the rationale for employing both the consumer-expectation test and the risk-utility test. *Lamkin*, 138 Ill. 2d at 529, citing *Parker v. Avco Distributing Corp.*, 82 Ill. 2d 211, 219-20 (1980), citing *Barker*, 20 Cal. 3d at 427-28, 573 P.2d at 452, 143 Cal. Rptr. at 234-35. We reiterated that rationale, and our citation to *Barker*, in *Calles*. *Calles*, 224 Ill. 2d at 255-56. Following a brief explanation of the rationale of *Barker*, we directed the reader to "see also" *Soule*, which, we explained in a parenthetical remark, refined the *Barker* risk-utility test and held that the " 'consumer expectations test is reserved for cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions,' " but that " 'the risks and benefits of a challenged design must be carefully balanced whenever the issue of design defect goes beyond the common experience of the product's users.' " (Emphases omitted.) *Calles*, 224 Ill. 2d at 256, quoting *Soule*, 8 Cal. 4th at 567, 882 P.2d at 308, 34 Cal. Rptr. 2d at 617. We reject this argument. Our mere citation of *Soule*, using the signal "see also," and without further discussion, cannot be read as this court's adoption of a new rule that would necessarily overrule *Lamkin* and its progeny.

*Calles* concluded that a product that presents an open and obvious danger is not *per se* exempt from application of the risk-utility test in a strict liability case. *Calles*, however, did not address the issue raised by defendants in the present case–whether a complex product is *per se* exempt from the consumer-expectation test.

Nothing in our past decisions, even where we have applied the risk-utility test, has signaled a rejection of the consumer-expectation test merely because a complex product was involved. For example, in *Hansen*, which involved a complex product (*Hansen*, 198 Ill. 2d at 437 (intravenous catheter connecting device is not simple)), we found

-18-

that the evidence at trial was sufficient to sustain a finding of defective design under both tests. *Hansen*, 198 Ill. 2d at 435 (consumer-expectation), 437-38 (risk-utility). We, therefore, reject defendants' claim that under Illinois law the risk-utility test is the sole measure of the dangerousness of an allegedly defectively designed product in all strict liability cases or in a subset of those cases.

(2)

Defendants argue that if we have not adopted the risk-utility test as the sole, exclusive test in design defect cases, we should do so now. They argue, in the alternative, that if we do not adopt the risk-utility test as the sole, exclusive test in all design defect cases, it should be the sole, exclusive test when the product is complex and the circumstances are not familiar to the ordinary consumer. This case, they insist, illustrates the need to restrict application of the consumer-expectation test to claims of defective manufacture or, at least, to design defects in simple products.

According to defendants, the consumer-expectation test evolved to evaluate claims of manufacturing defect where it is reasonable to believe that jurors, as ordinary consumers, can rely on their own experience and expectations to determine whether a manufacturing defect has rendered a product unreasonably dangerous. This, defendants assert, is a simple, straight-forward inquiry focused on one particular "unit" of the product and not on the product as a whole. Thus, there are no countervailing benefits to consider when a manufacturing defect is alleged.

The consumer-expectation test, defendants argue, does not make sense when a design defect is alleged because design decisions, by their very nature, involve considerations of the feasibility of alternative designs, cost, safety, and other factors with which the ordinary consumer is not familiar. In the context of the present case, defendants assert, the jurors could not have had reasonable expectations of their own regarding the proper degree of rigidity or flexibility in a car seat or how a seat should function in a wide range of potential accident conditions. According to defendants, the risk-utility test is specifically fashioned to evaluate this kind of claim and

should be the sole measure of whether the product is unreasonably dangerous due to a design defect.

Plaintiff responds that defendants are proposing a "radical theory," adoption of which would overrule *Lamkin*, *Hansen*, and *Calles*. Even if the proposed new rule were limited to cases involving complex products, plaintiffs claim, the distinction between simple and complex products is unworkable because there is no rational basis on which to distinguish them. Indeed, plaintiff points out, this court was divided in *Calles* on the question of whether the utility lighter was a "simple" product. See *Calles*, 224 Ill. 2d at 274 (Karmeier, J., specially concurring).

The rule advocated by defendants is contained in section 2(b) of the Products Liability Restatement, which would allow a finding of design defect only "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design *** and the omission of the alternative design renders the product not reasonably safe." Restatement (Third) of Torts: Products Liability §2(b), at 14 (1998).

If we were to accept defendants' invitation to adopt section 2(b) of the Products Liability Restatement, we would indeed overrule precedent, because section 2(b) would redefine the elements of a product liability claim based on alleged defective design.

Under Illinois law, the elements of a claim of strict liability based on a defect in the product are: (1) a condition of the product as a result of manufacturing or design, (2) that made the product unreasonably dangerous, (3) and that existed at the time the product left the defendant's control, and (4) an injury to the plaintiff, (5) that was proximately caused by the condition. The plaintiff has the burden of proof on each element. See *Sollami*, 201 Ill. 2d at 7; *Suvada*, 32 Ill. 2d at 623.

Section 2(b) of the Products Liability Restatement would alter the "unreasonably dangerous" element in design defect cases in two significant ways. First, a plaintiff would be required to plead and prove the existence of a feasible alternative design in every case. Second, instead of proving that the defect rendered the product "unreasonably dangerous," the plaintiff would have the burden of proving that the product was "not reasonably safe."

The first of these new elements was briefly a part of Illinois law. In 1995, enactment of Public Act 89–7, the so-called "Tort Reform Act," added section 2–2104 to the Code of Civil Procedure. This section provided that in strict product liability actions, the design of a product is "presumed to be reasonably safe," unless the plaintiff proves that, "at the time the product left the control of the manufacturer, a practical and technically feasible alternative design was available that would have prevented the harm without significantly impairing the usefulness, desirability, or marketability of the product." 735 ILCS 5/2–2104 (West 1996) (declared unconstitutional).

In 1997, this court decided *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 467 (1997), which held Public Act 89–7 unconstitutional in its entirety. Section 2–2104, standing alone, was not found unconstitutional, but this court held in *Best* that provisions of the act that were essential to the legislative purpose could not be severed from the rest of the act.

Our legislature has not reenacted this provision in the decade since *Best* was decided. We are reluctant to make a change that would so fundamentally alter the law of product liability in this state based solely on the suggestion that the drafters of the Restatement have a better idea of what the law should be than our own legislature. Such a change, if it is to be made, is a matter of public policy, better suited to legislative action than judicial decisionmaking.

As for the second alteration, adoption of section 2(b) of the Products Liability Restatement would require the plaintiff to prove that the alleged defect renders the product "not reasonably safe" rather than "unreasonably dangerous." This change has its roots in a law review article that argued:

> "[T]he term 'unreasonably dangerous' gives rise to the impression that the plaintiff must prove that the product was 'unusually or extremely dangerous.' The term 'not reasonably safe' is less subject to misinterpretation." Restatement (Third) of Torts: Products Liability §2, Reporters' Note, at 80 (1978), citing J. Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L.J. 5, 15 (1965), and J. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 833 (1973).

-21-

The term "not reasonably safe" offers an "aspirational advantage," because it "elevates the norm" to one of reasonable safety, and "serves symbolically to provide a signal that (reasonable) product safety–as a positive goal required by the law–must now be afforded a central place in the decisional calculus of manufacturers." Restatement (Third) of Torts: Products Liability §2, Reporters' Note, at 80-81 (1998), citing D. Owen, *Defectiveness Restated: Exploding the 'Strict' Products Liability Myth*, 1996 U. Ill. L. Rev. 743, 777.

Our concern is less with the aspirational goal that might be set for manufacturers than with parties' and jurors' need for clarity. In effect, under the existing "unreasonably dangerous" test, jurors are asked to determine whether a product is too dangerous; under the proposed "not reasonably safe" test, they would be asked whether it is not safe enough. We find the former more likely to be understood by the average juror. See IPI Civil (2006) No. 400.01, Comment, at 553 (noting that the phrase "not reasonably safe" might be interchangeable with "unreasonably dangerous," but that the "Restatement, and *Suvada* and all its progeny, furnish persuasive authority that the jury should be instructed that it is the 'unreasonably dangerous' condition of the product which leads to liability").

By urging adoption of the Products Liability Restatement's formulation of the elements of a strict product liability design defect claim, defendants seek a change in the substantive law of this state. This argument goes far beyond their assertion that the jury in this particular case was not properly instructed and would require our overruling *Lamkin*, *Hansen*, and *Calles*, at least in part. We, therefore, decline defendants' invitation to adopt section 2(b) of the Products Liability Restatement. Thus, the existence of a feasible alternative design and the balancing of risks and benefits are relevant considerations in a strict product liability design defect case, but they are not elements of the claim that the plaintiff is required to plead and prove in every case.

(3)

We now turn to defendants' alternative argument that even if the risk-utility test is not the sole, exclusive test for strict product liability

based on defective design, they are nevertheless entitled to a jury instruction on the risk-utility test under the circumstances of this case.

We concluded in *Calles* that when a plaintiff's claim cannot meet the consumer-expectation test, it may nevertheless be proven using the risk-utility test. *Calles*, 224 Ill. 2d at 256. No issue was raised in *Calles* regarding jury instructions because *Calles* came to us after a grant of summary judgment. We reversed that judgment and remanded for trial, but our analysis necessarily foreclosed consideration on remand of the consumer-expectation test for unreasonable dangerousness. Our holding required that only the risk-utility test be applied at trial. The result we reached in *Calles* leads to the inescapable conclusion that the present instruction on unreasonable dangerousness, IPI Civil (2006) No. 400.06, which focuses the jury's inquiry on the use to which the product was being put at the time of the injury, is inappropriate in some cases. In order to ensure that the jury undertakes the appropriate inquiry when the consumer-expectation analysis does not apply, as in *Calles*, an instruction that incorporates consideration of risk and utility, including the feasibility of an alternative design, is required.

The question posed in the present case is whether the same holds true when the consumer-expectation test is not foreclosed from jury consideration. In effect, defendants argue that the answer to the risk-utility test "trumped" the answer to the consumer-expectation test in *Calles* and that it should do so even when the consumer expectation test favors plaintiff and the risk-utility test favors the defendant. The only consideration, defendants claim, should be whether the issue of risk-utility has been raised by the evidence presented. Defendants rely on this court's decision in *Kerns*, where we held that a nonpattern jury instruction on the feasibility of an alternative design was properly given because the trial court must instruct the jury on all issues raised by the evidence. *Kerns*, 76 Ill. 2d at 164. See also *Rios v. Navistar International Transportation Corp.*, 200 Ill. App. 3d 526, 537 (1990) (each party has the right to have the jury instructed on his theory of the case and the circuit court, in exercising its discretion, must instruct the jury on all issues that it finds have been raised by the evidence presented).

Plaintiff responds that it is her choice whether to proceed under the "consumer-expectation theory" or the "risk-utility theory" of

design defect. She notes that "plaintiffs are masters of their complaint and are entitled to proceed under whichever theory they decide, so long as the evidence supports such a theory," citing *Reed v. Wal-Mart Stores, Inc.*, 298 Ill. App. 3d 712, 717-18 (1998). See also *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 59 (2007) (referring to plaintiffs as "masters of their complaint"). Plaintiff argues that it would be "utterly absurd" for defendants to "choose the theory plaintiff pursues at trial." She states that she chose to try her case under "what is labeled the 'consumer expectation' theory of strict liability" rather than the other "form of strict liability," risk-utility. She concludes that the trial court was not required to instruct the jury on "other potential theories of liability" that might have been available to her. Plaintiff further asserts that the instructions given accurately state that law and have never been modified because no modification has been needed.

Plaintiff has confused theories of liability with methods of proof. This court has recognized three theories of strict product liability: manufacturing defect, design defect, and failure to warn. *Sollami*, 201 Ill. 2d at 7. In *Hansen*, the plaintiff claimed strict liability under both the failure to warn and design defect theories. *Hansen*, 198 Ill. 2d at 423-24. Similarly, in *Blue*, the plaintiff pleaded two theories of liability–negligence and strict liability–but was forced to proceed only with the negligence claim because the strict liability claim was barred by the statute of repose. *Blue*, 215 Ill. 2d at 81. In the present case, plaintiff has chosen to proceed under the design defect theory of strict product liability.

In *Lamkin*, we stated that a plaintiff "may demonstrate that a product is defective in design, so as to subject a retailer and a manufacturer to strict liability for resulting injuries, in one of two ways." *Lamkin*, 138 Ill. 2d at 529. We then set out the consumer-expectation test and the risk-utility test. These two tests, therefore, are not *theories of liability*; they are *methods of proof* by which a plaintiff "may demonstrate" that the element of unreasonable dangerousness is met. See, *e.g.*, *Heastie v. Roberts*, 226 Ill. 2d 515, 542 (2007) (explaining that the *res ipsa loquitur* doctrine is a "species of circumstantial evidence" that may be used to prove the element of breach of duty when the theory of liability is negligence).

In the present case, plaintiff elected to proceed under a theory of strict product liability based on design defect and not to pursue a negligence claim. She also chose to rely on the consumer-expectation method of proof, as demonstrated by the jury instructions she submitted. Defendants are not asserting that they have the right to choose plaintiff's theory of liability. Rather, defendants are asserting that they, too, have the right to put on their case using any permissible method of proof. When the record contains evidence relevant to their chosen method of proof, they insist that they are entitled to a corresponding jury instruction. Their tendered instruction, defendants claim, is the only way to ensure that the jury utilizes the proper analytical framework to test the evidence before it.

These arguments pose two questions for this court. First, is a defendant entitled to an instruction on the risk-utility test over the objection of a plaintiff whose chosen method of proof is consumer expectation? Second, if both consumer-expectation and risk-utility instructions are given and the tests yield inconsistent answers, which result prevails?

"[T]he parties are entitled to have the jury instructed on the issues presented, the principles of law to be applied, and the necessary facts to be proved to support its verdict." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002). The threshold for giving an instruction in a civil case is "not a high one." *Heastie*, 226 Ill. 2d at 543.

> "Generally speaking, litigants have the right to have the jury instructed on each theory supported by the evidence. Whether the jury would have been persuaded is not the question. All that is required to justify the giving of an instruction is that there be some evidence in the record to justify the theory of the instruction. The evidence may be insubstantial." *Heastie*, 226 Ill. 2d at 543.

The decision to give or deny a tendered instruction is within the discretion of the trial court. *Dillon*, 199 Ill. 2d at 505. So long as the tendered instructions clearly and fairly instruct the jury, a party is entitled to instructions on any theory of the case that is supported by the evidence. *Snelson v. Kamm*, 204 Ill. 2d 1, 27 (2003). As the appellate court has noted, "[i]t is within the discretion of the trial court to determine which issues are raised by the evidence presented

and which jury instructions are thus warranted." *Brdar v. Cottrell, Inc.*, 372 Ill. App. 3d 690, 704 (2007).

The expression "theory of the case" does not refer to the plaintiff's theory of liability. It refers, instead, to each party's framing of the issues and arguments in support of its position. It is, therefore, well established that while a plaintiff is entitled to an instruction setting out her own theory of the case, based on her theory of liability and her chosen method of proof, she may not unilaterally preclude the giving of a jury instruction that presents the defendant's theory of the case, so long as the defendant's instruction accurately states the law and is supported by the evidence. Assuming, for now, that defendants' tendered instructions met these criteria, we consider the implications of giving a jury both consumer-expectation and risk-utility instructions in a design defect case.

If a jury were to consider the two tests independently, there are four possible outcomes. First, the product could be found unreasonably dangerous under both tests and judgment would be for the plaintiff. This was the case in *Hansen*, where the design of a complex medical device was at issue. *Hansen*, 198 Ill. 2d at 435-36.

Second, the product could be found not unreasonably dangerous under either test and judgment would be for the defendant. This was the case in *Lamkin*, where the design of a window screen was at issue. *Lamkin*, 138 Ill. 2d at 529-31.

Third, the product could be found not unreasonably dangerous under the consumer-expectation test, but unreasonably dangerous under the risk-utility test. In such a case, judgment would be for the plaintiff. This is the possible outcome of *Calles* on remand, where the design of a utility lighter was at issue. *Calles*, 224 Ill. 2d at 256.

Defendants in the present case posit the fourth possible outcome when the two tests are applied independently. The product could be found unreasonably dangerous under the consumer-expectation test, but risk-utility analysis could reveal that an alternative is not available, or that available alternatives are not feasible, or that the benefits of the design outweigh its inherent risks. In such a case, defendants argue, the result of the risk-utility test should trump the result of the consumer-expectation test. Defendant argues that if the tests are treated as alternatives so that a plaintiff may prevail by

meeting either test, the effect will be to impose absolute–not just strict–liability. This will occur, defendants claim, because the consumer-expectation test will, at least where a complex product is involved, almost always lead to a finding of unreasonable dangerousness. As a result, defendants will be liable for all injuries in all circumstances, no matter how much the risk-utility balance weighs in favor of the challenged product design.

Defendants cite *Mele v. Howmedica, Inc.*, 348 Ill. App. 3d 1 (2004), and *Besse v. Deere & Co.*, 237 Ill. App. 3d 497 (1992), in support of this argument. These cases have been overruled, at least to the extent they relied on *Scoby*, by our decision in *Calles*. See *Calles*, 224 Ill. 2d at 260 (listing appellate court decisions, including *Mele*, *Besse*, and *Wortel*, that had followed the "so called 'simple product' exception" of *Scoby*). Nevertheless, defendants point to the appellate court's efforts in *Mele* and *Besse* to fashion an "integrated test" for design defect, combining the consumer-expectation test and the risk-utility test.

In *Besse*, the defendant appealed from a judgment of strict liability due to defective design of a cornpicker, arguing that the elements of unreasonable dangerousness and proximate causation were not proven. *Besse*, 237 Ill. App. 3d at 499. The plaintiff presented evidence that the loss of her leg could have been prevented with a simple design modification that would not have hindered the machine's function and that the necessary technology was available to the defendant when the machine was manufactured. *Besse*, 237 Ill. App. 3d at 501. The defendant argued on appeal that the machine operated exactly as it was designed to operate and, therefore, it could not be found unreasonably dangerous under the consumer-expectation test. *Besse*, 237 Ill. App. 3d at 500. The appellate court noted that the "narrow test" set out in comment *i* to section 402A of the Restatement (Second) of Torts (1965) is not a complete statement of the law in Illinois. Rather, the court observed, "a broader definition of 'unreasonably dangerous' is available to the products liability plaintiff," and this broader definition "embraces both the 'consumer expectation' test and a 'risk/utility analysis' test." *Besse*, 237 Ill. App. 3d at 500. The two tests, according to the *Besse* court, are "not mutually exclusive." *Besse*, 237 Ill. App. 3d at 501. The evidence presented in *Besse* "presented a factual question of whether the

product was unreasonably dangerous when analyzed under the integrated consumer expectation test and risk/benefit analysis test," and the jury found this "integrated" test met by the plaintiff's evidence. *Besse*, 237 Ill. App. 3d at 501.

No issue was raised in *Besse* regarding jury instructions. However, despite its misplaced reliance on *Scoby* (*Besse*, 237 Ill. App. 3d at 501-02), we agree with the *Besse* court that the two tests are not mutually exclusive and may be applied together if the evidence supports it.

In *Mele*, the manufacturer of a medical device implanted in a patient as part of a hip replacement procedure was held strictly liable on a theory of defective design. The plaintiff utilized the consumer-expectation method of proof, arguing to the jury that the device "did not perform as safely as an ordinary implantee would expect." The plaintiff objected, successfully, to the defendant's attempt "to show that the benefits of the product outweighed its risks." *Mele*, 348 Ill. App. 3d at 8.

The appellate court noted that to "show that a product is unreasonably dangerous due to a defective design, a plaintiff must present evidence that the design includes 'a defect which subjects those exposed to the product to an unreasonable risk of harm.' " (Emphasis omitted.) *Mele*, 348 Ill. App. 3d at 13, quoting *Hunt v. Blasius*, 74 Ill. 2d 203, 211 (1978). A plaintiff may make this showing in either of two ways: consumer expectation or risk utility. *Mele*, 348 Ill. App. 3d at 14. The defendant urged the court to adopt section 6(c) of the Products Liability Restatement, which would apply a risk-utility test to strict liability claims involving prescription drugs or medical devices. *Mele*, 348 Ill. App. 3d at 15-16. The court rejected this suggestion because adoption of section 6(c) would "completely eliminate[ ] appraisal of the consumer's expectations from determination of whether a medical device is unreasonably dangerous." The section, therefore, "conflicts with Illinois law." *Mele*, 348 Ill. App. 3d at 16.

The *Mele* court next considered the defendant's argument that the trial court erred by excluding all evidence of the risks and benefits of the device. The trial court found this evidence irrelevant because the plaintiff "sought to prove only that defendant's product failed to meet the ordinary consumer's expectations for the safety of the product"

and specifically decided not to seek to prove the design "unreasonably dangerous by showing its risks outweighed its benefits." *Mele*, 348 Ill. App. 3d at 17. The court noted that there was "no Illinois authority on the issue of whether a defendant may present evidence that the benefits of a product's design outweigh its risks when a plaintiff argues that the product is unreasonably dangerous because it fails to meet ordinary consumer expectations for its safety." *Mele*, 348 Ill. App. 3d at 17. After exploring the evolution of the two tests, the court cited *Besse* for the proposition that when a plaintiff alleges a design defect in a complex product, the product's danger should be evaluated "using a test that incorporates both the ordinary consumer's expectations and the risks and benefits of the product." *Mele*, 348 Ill. App. 3d at 19. After further discussion related to medical devices in particular, the *Mele* court concluded that the trial court erred by excluding evidence of the risks and benefits of the hip replacement device. The evidence contained in defendant's offer of proof could have shown "that the product was not unreasonably dangerous under the integrated test recommended in *Besse*." *Mele*, 348 Ill. App. 3d at 20. The appellate court, therefore, reversed the judgment of the trial court and remanded for retrial. *Mele*, 348 Ill. App. 3d at 20-21.

No issue was raised in *Mele* regarding jury instructions. However, *Mele* does suggest that even when a plaintiff chooses to proceed under the consumer-expectation test, she cannot dictate the defendant's method of proving its case by preventing the admission of evidence relevant to the risk-utility analysis. We agree with *Mele* in this regard.

In the present case, both parties presented evidence relevant to the risk-utility inquiry, so the question is whether, having argued that the risk-utility evidence favors its position, defendant is entitled to have the jury specifically instructed on the test. We conclude that this question is resolved by examining the scope of each inquiry.

The consumer-expectation test is a single-factor test and, therefore, narrow in scope. See *Besse*, 237 Ill. App. 3d at 500 (describing the consumer-expectation test as "narrow"). The jury is asked to make a single determination: whether the product is unsafe when put to a use that is reasonably foreseeable considering its nature and function. IPI Civil (2006) No. 400.06. No evidence of ordinary consumer expectations is required, because the members of the jury

may rely on their own experiences to determine what an ordinary consumer would expect. *Mele*, 348 Ill. App. 3d at 14.

The risk-utility test, in contrast, is a multifactor analysis and, therefore, much broader in scope. Under an "integrated" test, as envisioned by the *Mele* and *Besse* courts, consumer expectations are but one of the factors to be considered. *Mele*, 348 Ill. App. 3d at 20; *Besse*, 237 Ill. App. 3d at 501.

Although we have declined to adopt section 2 of the Products Liability Restatement as a statement of substantive law, we do find its formulation of the risk-utility test to be instructive. Under section 2(b), the risk-utility balance is to be determined based on consideration of a "broad range of factors," including "the magnitude and probability of the foreseeable risks of harm, the instructions and warnings accompanying the product, and the *nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing*," as well as "the likely effects of the alternative design on production costs; the effects of the alternative design on product longevity, maintenance, repair, and esthetics; and the range of consumer choice among products." (Emphasis added.) Restatement (Third) of Torts: Products Liability §2, Comment *f*, at 23 (1998).

This formulation of the risk-utility test is an "integrated" test of the kind envisioned by the appellate court in *Mele* and *Besse*. Under this formulation, consumer expectations are included within the scope of the broader risk-utility test. In addition, the test refines the consumer-expectation factor by specifically allowing for advertising and marketing messages to be used to assess consumer expectations.

We adopt this formulation of the risk-utility test and hold that when the evidence presented by either or both parties supports the application of this integrated test, an appropriate instruction is to be given at the request of either party. If, however, both parties' theories of the case are framed entirely in terms of consumer expectations, including those based on advertising and marketing messages, and/or whether the product was being put to a reasonably foreseeable use at the time of the injury, the jury should be instructed only on the consumer-expectation test.

Adoption of this integrated test resolves the question of whether the answer to the risk-utility test "trumps" the answer to the consumer-expectation test because the latter is incorporated into the former and is but one factor among many for the jury to consider. This is consistent with our conclusion in *Calles* that while a plaintiff might not prevail under the single-factor test, she might still prevail under the multifactor test. See *Calles*, 224 Ill. 2d at 256.

In sum, we hold that both the consumer-expectation test and the risk-utility test continue to have their place in our law of strict product liability based on design defect. Each party is entitled to choose its own method of proof, to present relevant evidence, and to request a corresponding jury instruction. If the evidence is sufficient to implicate the risk-utility test, the broader test, which incorporates the factor of consumer expectations, is to be applied by the finder of fact.

In the present case, the occupant of the car seat was killed when the car was struck from behind. Rear-end collisions are reasonably foreseeable and the ordinary consumer would likely expect that a seat would not collapse rearward in such an accident, allowing the occupant to sustain massive head injury. Thus, the jury concluded that the car seat was unreasonably dangerous because it proved "unsafe when put to a use that is reasonably foreseeable considering the nature and function of the product." See IPI Civil (2006) No. 400.06. If the evidence presented was sufficient to require the jury to engage in risk-utility analysis, this conclusion as to consumer expectations would be properly considered as one factor in the broader, integrated risk-utility analysis.

(4)

In *Kerns*, the plaintiff lost an eye when he was struck by a wire that was part of the power takeoff assembly of a forage blower. *Kerns*, 76 Ill. 2d at 159. He presented evidence of an alternative design. *Kerns*, 76 Ill. 2d at 164. This court held that the trial court properly gave the defendant's nonpattern instruction on feasibility, over the plaintiff's objection. *Kerns*, 76 Ill. 2d at 164.

A familiar treatise cites *Kerns* for the following proposition:

> "In a products liability action for injuries caused by a defective product, the instructions must state correctly the

legal principles applicable to the case. The instructions should state the correct issues and should be supported by the evidence." 30A Ill. L. & Prac. *Products Liability* §91, Instructions, at 146-47 (1994).

We must next consider whether the trial court erred by refusing to give the nonpattern instruction tendered by the defendants. This requires us to determine: (a) if defendants' tendered nonpattern instructions were adequate to preserve the jury instruction issue for review on appeal, (b) if the evidence was sufficient to support the giving of an instruction on the risk-utility test, and (c) if these criteria are met, whether the trial court's refusal to instruct the jury on the risk-utility test is error requiring a new trial.

(a)

A party forfeits the right to challenge a jury instruction that was given at trial unless it makes a timely and specific objection to the instruction and tenders an alternative, remedial instruction to the trial court. *Deal v. Byford*, 127 Ill. 2d 192, 202-03 (1989). These requirements ensure that the trial court has the opportunity to correct a defective instruction and to prevent the challenging party from gaining an unfair advantage by failing to act when the trial court could remedy the faulty instruction and then obtaining a reversal on appeal. *Morus v. Kapusta*, 339 Ill. App. 3d 483, 489 (2003).

Thus, in *Morus*, the defendant was found not to have forfeited his right to challenge a jury instruction on damages for reduced life expectancy because the instruction had been "a central topic of debate among the parties and the trial court at several junctures," the defendant specifically objected to the instruction, and the defendant "also submitted an instruction to the court on this issue." The appellate court, therefore, found the jury instruction issue preserved for review. *Morus*, 339 Ill. App. 3d at 489-90.

In the present case, defendants objected to plaintiff's version of IPI Civil No. 400.06, which was given by the trial court:

"When I use the expression 'unreasonably dangerous' in these instructions, I mean unsafe when put to a use that is reasonably foreseeable considering the nature and function of the car."

This instruction is generally considered to express the consumer-expectation test because it does not call upon the jury to use anything outside its own experience to determine whether the product is defective because it is unsafe when used in a reasonably foreseeable manner.

Defendants' tendered nonpattern instructions numbers 17 and 29 were refused:

> "A product is defective in its design when the foreseeable risks of harm posed by the product outweigh the benefits of the design and the risks can be avoided or reduced by the adoption of alternative feasible design. Feasible alternative designs must be available at the time that the product left the control of the defendant.

> Feasibility includes not only elements of economy, effectiveness, and practicality, but also technological possibilities under the state of the manufacturing art at the time the product was produced."

> "When evaluating the reasonableness of a design alternative, the overall safety of the product must be considered. It is not sufficient that the alternative design would have reduced or prevented the harm suffered by the plaintiff if it would also have introduced into the product other dangers of equal or greater magnitude. A product's design may be reasonably safe even if the product is not accident proof."

Defendants note that despite this court's recognition of the risk-utility test in *Lamkin*, *Blue*, and *Calles*, no corresponding pattern instruction has been developed. Thus, they argue, current pattern instructions no longer reflect Illinois law and a nonpattern instruction is necessary when the jury is required to assess the risk-utility of a product. Defendants support their tendered nonpattern instructions by citation to Supreme Court Rule 239(a) (177 Ill. 2d R. 239(a) ("Whenever IPI does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given in that subject should be simple, brief, impartial, and free from argument")), *Lamkin* and its progeny, and to the Products Liability Restatement. See also *Gordon v. Chicago Transit Authority*, 128 Ill.

App. 3d 493, 501 (1984) (nonpattern instructions are permitted where the case presents a unique factual situation or point of law not addressed by the IPI and which requires clarification or amplification).

Plaintiff responds that defendants' nonpattern instructions are not an accurate statement of the law and, therefore, did not meet the threshold requirement of having tendered an alternative instruction that correctly states the legal principles applicable to the case. Specifically, plaintiff asserts that none of the "concepts" contained in the nonpattern instructions are part of the plaintiff's burden of proof in a product liability case. Plaintiff also argues that the nonpattern instruction is confusing.

Plaintiff is correct that a product liability plaintiff is not required to utilize the risk-utility method of proof and does not have a "burden" of proving the existence of a feasible alternative design. She does, however, have the burden of proving that the product is unreasonably dangerous due to a design defect. If, however, a product liability defendant introduces evidence that no feasible alternative design exists or that the design offers benefits that might outweigh its risks, the plaintiff who does not rebut such evidence with evidence of her own runs the risk that the trier of fact may resolve the issue against her. Given our fact-pleading rule (*Iseberg v. Gross*, 227 Ill. 2d 78, 87 (2007)), discovery procedures, and rules requiring the disclosure of witnesses (735 ILCS 5/2–1003 (West 2006); 210 Ill. 2d R. 201)), it should not come as a surprise to any product liability plaintiff that the defendant intends to utilize the risk-utility method of proof and to seek a corresponding jury instruction.

Our review of the record reveals that the risk-utility test was a central topic of debate among the parties, the defendants specifically objected to plaintiff's instruction on the consumer-expectation test, and the defendants submitted a nonpattern instruction on the risk-utility test. The tendered nonpattern instructions would not have placed a burden on the plaintiff to prove the existence of a feasible alternative design. In addition, plaintiff herself used evidence relevant to the risk-utility inquiry in her case in chief to bolster her consumer-expectation argument. She cannot have been surprised that defendants responded with evidence relevant to the risk-utility inquiry, argued to the jury that the benefits of the seat's design outweighed its risks, and

-34-

sought an instruction that would have directed the jury's attention to this inquiry. Further, we are not persuaded by plaintiff's argument that the tendered nonpattern instruction is so flawed or confusing that it did not meet the standard set out in *Deal*. Defendants, therefore, have properly preserved for appeal the question of whether the evidence presented was sufficient to entitle them to have the jury instructed on the risk-utility test.

(b)

Each party has the right to have the jury clearly and fully instructed on any relevant theory of the case that is supported by the evidence. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995). Thus, the second question that must be addressed in this section is whether the risk-utility test was sufficiently implicated by the evidence presented during the 2½-week trial that it would have been proper to give such an instruction. See *Heastie*, 226 Ill. 2d at 543 ("[a]ll that is required to justify the giving of an instruction is that there be some evidence in the record to justify the theory of the instruction"). This is a question that is readily answered by this court's review of the record. See 374 Ill. App. 3d at 650-53 (appellate court's summary of the testimony at trial).

Defendants argue that the question of risk utility was raised by the evidence presented by both parties, specifically by the expert testimony regarding the feasibility of other seat designs, the results of crash tests, the commercial availability of cars with alternative seat designs at the time the Escort was manufactured, the risks posed by rigid seats, and the circumstances in which a yielding seat would be safer than a rigid seat. This evidence, defendants assert, was sufficient to justify a jury instruction on the risk-utility test.

Plaintiff does not deny that the evidence was sufficient to meet this rather low threshold, but argues that it is her choice, as plaintiff, whether to proceed under the "consumer-expectation theory" or the "risk-utility theory" of design defect.

As noted above, plaintiff has chosen her theory of liability (design defect) and her method of proof (consumer expectation). She may not

choose defendants' theory of defense (absence of design defect, lack of proximate cause) or their method of proof (risk utility).

We conclude, based on our review of the record, that sufficient evidence was presented at trial to raise an issue regarding the risk versus the utility of the CT20 seat design and to justify a corresponding jury instruction.

(c)

Having established that the tendered nonpattern instruction was adequate to preserve defendants' jury instruction issue for appeal and that the evidence presented at trial was sufficient to justify the giving of an instruction on the risk-utility test, the question remains whether the trial court erred by refusing the tendered instruction.

Plaintiff correctly notes that the standard of review on this issue is abuse of discretion. *Dillon*, 199 Ill. 2d at 505. Defendants acknowledge that the trial court has discretion in instructing the jury, but assert that refusal to instruct the jury on a theory supported by the evidence, when that refusal prejudices the requesting party's right to a fair trial, is an abuse of discretion (citing *McCarthy*, 355 Ill. App. 3d at 970). This prejudice-based formulation of the abuse of discretion standard is not one that this court has had occasion to use, although the standard has often been expressed in these terms by the appellate court. See, *e.g.*, *Smith v. Marvin*, 377 Ill. App. 3d 562, 567 (2007); *Frigo v. Silver Cross Hospital & Medical Center*, 377 Ill. App. 3d 43, 77 (2007); *Barth v. State Farm Fire & Casualty Co.*, 371 Ill. App. 3d 498, 504 (2007); *Schmidt v. Ameritech Illinois*, 329 Ill. App. 3d 1020, 1031 (2002).

We agree with the cited cases that when a party tenders a jury instruction that states the legal principles applicable to the case and that instruction is supported by the evidence, it is an abuse of discretion to refuse to give the instruction if the refusal prejudices the party's right to a fair trial.

On the merits, defendants claim the evidence showed that the designers of the CT20 seat had to take into account all of the various types of possible collisions (front-end, rear-end, side, rollover) that could occur at a wide range of speeds, and with occupants of different sizes, who may or may not be properly using their seatbelts,

-36-

positioned at various seats in the vehicle. This "complex set of considerations," defendants assert, is not amenable to consumer-expectation analysis. As a result, they tendered the nonpattern instruction to focus the jury's inquiry on the evidence regarding the availability of feasible alternative designs, the risk posed by the CT20 seat, and the benefits of the CT20 design. If the court had given the tendered nonpattern risk-utility instruction instead of the pattern instruction, defendants posit, the jury would have been directed to weigh this evidence, including expert testimony that the yielding seat that caused James's death might nevertheless have been a safer alternative for other drivers in other types of collisions. Defendants also point to testimony by one of their own experts that the yielding driver's seat may have prevented fatal or more serious injury to the backseat passenger even while causing more serious injury to James.

Defendants claim that they were prejudiced by the refusal of their instruction because the jurors were given no guidance as to how they were to assess the evidence and no instruction that directed them to balance risks and benefits. As a result, defendants argue, the jury's deliberations were "untethered to any rule of law." Under IPI Civil (2006) No. 400.06 as given, the jurors were merely asked to determine whether the seat was unsafe when used in a reasonably foreseeable manner, such as being stopped at a red light. Defendants posit that any jury would be likely to find the seat unreasonably dangerous under this standard, because the accident was fatal and because they were not specifically instructed to give due consideration to the evidence of benefits, risks, and alternative designs. As a result, the jury may have done "rough justice" based on their sympathy for the tragic death of a young husband and father, without considering, for example, the evidence that 99.6% of the cars on the road at that time were equipped with yielding seats.

Plaintiff responds that she tendered the applicable pattern instructions in total compliance with Supreme Court Rule 239 and that no case of this court has ever held that an additional instruction setting out the risk-utility test is required. She relies on *Carrillo v. Ford Motor Co.*, 325 Ill. App. 3d 955 (2001), to argue that the trial court did not abuse its discretion.

*Carrillo* involved the same mechanism of injury as the present case (a rear-end collision in which the driver of a Ford vehicle was

killed or injured when the car seat collapsed on impact), and the same theory of liability (product liability due to design defect). The same judge who presided in the present case gave the same jury instructions. (The jury instructions that were given in *Carrillo* were provided to the trial court in the present case and are part of the record.) The trial testimony in the two cases was similar, including testimony by some of the same expert witnesses for both sides. See 374 Ill. App. 3d at 650-53; *Carrillo*, 325 Ill. App. 3d at 958-63. The *Carrillo* jury returned a verdict for the plaintiff and this judgment was affirmed on appeal.

Ford argued on appeal that the trial court erred by refusing to give the following instruction, based on IPI Civil (2000) No. 400.07:

> " 'It is the duty of an automobile manufacturer to furnish a product which is in a reasonably safe condition when put to a use that was reasonably foreseeable considering its nature and intended function.' " *Carrillo*, 325 Ill. App. 3d at 963-64, quoting IPI Civil (2000) No. 400.07.

The appellate court affirmed, for several reasons. First, the rejected instruction uses the expression "reasonably safe," which suggests that the jury is to determine whether the product's design is "not reasonably safe." The court noted that this court had previously rejected the suggestion that this element of a strict liability claim should be expressed as "not reasonably safe" instead of "unreasonably dangerous." *Carrillo*, 325 Ill. App. 3d at 964, citing *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill. 2d 339, 343 (1969) (the test is whether the product is "unreasonably dangerous," even though the expression "not reasonably safe" might be "[s]omewhat preferable"). Further, the expression "not reasonably safe" is inconsistent with IPI Civil (2000) No. 400.06 and the comments thereto. IPI Civil (2000) No. 400.06, Comment, at 620.

Second, the appellate court found no Illinois decision, either from this court or the appellate court, that requires IPI Civil (2000) No. 400.07 to be given in design defect cases.

Third, IPI Civil (2000) No. 400.07 contains the word "duty," which, the appellate court suggested, should be avoided in strict liability instructions because it tends to blur the distinction between strict liability and negligence. The appellate court noted the absence

of comments to this instruction, thus giving trial courts no guidance as to when it should be used. *Carrillo*, 325 Ill. App. 3d at 965. (Partially in response to the concerns raised in *Carrillo*, the 2006 edition of the IPI Civil has replaced instruction 400.07 with a notation that "The Committee recommends that no instruction concerning the duty of strict product liability defendants be given, except in cases where [instructions regarding the duty to warn] are applicable." IPI Civil (2006) No. 400.07A.)

The *Carrillo* court held that IPI Civil (2000) No. 400.06 fully, fairly and comprehensively informed the jury of all the relevant legal principles. *Carrillo*, 325 Ill. App. 3d at 966.

Plaintiff's position is that if IPI Civil (2000) No. 400.06, standing alone, was a full, fair and comprehensive instruction in *Carrillo*, where the three-week trial included the same sort of evidence that was given in the present case, then it must also have been a full, fair, and comprehensive instruction in the present case. She insists that the trial court's hands were tied by *Carrillo*, because if the trial court had given the requested nonpattern instructions, it would have been acting inconsistently with applicable precedent and that, itself, would have been error.

We do not find *Carrillo* to be helpful. The nonpattern instruction tendered by defendants in the present case suffers from none of the infirmities affecting IPI Civil (2000) No. 400.07. In addition, the issue in *Carrillo* (whether a flawed pattern instruction should have been given) is not the same as whether a nonpattern instruction that states an applicable principle of law that has been implicated by the evidence should have been given.

We find our decision in *Dillon* instructive. *Dillon* involved a medical malpractice claim against a physician, a hospital, and other defendants. When an intravenous catheter was removed from the plaintiff/patient, a nine-centimeter fragment of the catheter remained in her vein. It subsequently migrated to her heart, where the tip of the fragment became embedded in the heart wall. Removal of the fragment would have been more dangerous than leaving it in place. The jury returned a verdict for the plaintiff. Included in the damages award was $500,000 for the increased risk of future injuries that might result from leaving the catheter fragment in place. *Dillon*, 199 Ill. 2d at 487-89.

The physician and the hospital argued on appeal that the trial court erred by giving a modified pattern jury instruction. Specifically, the trial court, at plaintiff's request, added a sentence to the pattern instruction that directed the jury to take into consideration the "increased risk of future injuries" when calculating the amount of damages. *Dillon*, 199 Ill. 2d at 497.

As in the present case, the debate over the jury instruction issue reflected a larger debate over the applicable law. Prior to *Dillon*, this court had rejected the risk of future injury as an element of damages. *Dillon*, 199 Ill. 2d at 497-98. After a careful analysis of the history of this rule, the case law from Illinois and elsewhere, the scholarly literature, the split of authority in our appellate court, and policy (*Dillon*, 199 Ill. 2d at 497-504), we held that "a plaintiff must be permitted to recover for *all* demonstrated injuries," including the risk of future injury. (Emphasis in original.) *Dillon*, 199 Ill. 2d at 504. We explained that the burden was on the plaintiff to quantify the degree of risk and that amount of compensation must reflect the probability of the occurrence of future injury. *Dillon*, 199 Ill. 2d at 504.

We then turned to the issue of jury instructions. At that time, there was no pattern jury instruction on the increased risk of future injury as an element of damages. Because the pattern jury instructions were inadequate, an additional instruction was appropriate. *Dillon*, 199 Ill. 2d at 505. The instruction that was given, however, failed to fully and fairly convey the newly adopted principle of law. *Dillon*, 199 Ill. 2d at 506. The instruction merely told the jury to consider the "increased risk of future injuries"; it did not convey the principle that the jury should consider the degree of risk of that future harm occurring and adjust the damages amount proportionally to the degree of the risk. *Dillon*, 199 Ill. 2d at 506-07.

In *Dillon*, a pattern jury instruction regarding damages was modified at plaintiff's request. The jury found the defendants liable and awarded damages. Having "definitively spoken" to a disputed question of law, we determined that a retrial on the damages issue, "in which a jury may apply the correct legal principles to the submitted evidence, is appropriate," because the jury "was inadequately instructed." *Dillon*, 199 Ill. 2d at 507-08.

In the present case, a nonpattern jury instruction was refused because the trial court determined that the risk-utility test did not

-40-

apply. The jury found defendants liable. We have definitively spoken to the questions of the applicability of the risk-utility test and its relationship to the consumer-expectation test. A retrial is required because the jury was inadequately instructed and was, therefore, unable to apply the correct legal principles to the submitted evidence.

We conclude that defendants were prejudiced by the failure to give an instruction that would have caused the jury to apply the risk-utility test in addition to the consumer-expectation test. Although defendants were not prevented from introducing evidence regarding the risks and benefits of the alternative designs that were feasible at the time, and were not prevented from arguing to the jury that, on balance, the CT20 seat was not "unreasonably dangerous" because it prevented more injuries than it caused, the jury was specifically instructed to focus its deliberations solely on whether the seat was unsafe when put to a reasonably foreseeable use. The lack of a risk-utility instruction, combined with the use of IPI Civil (2000) No. 400.06, prejudiced defendants' ability to obtain a full, fair, and comprehensive review of the issues by the jury. We, therefore, hold that the trial court's refusal to give the tendered instruction was an abuse of discretion.

We note that this decision does not preclude a plaintiff in a design defect case from proving her case using the consumer-expectation test. Indeed, both parties may litigate an entire case using the consumer-expectation test if, for example, the dispositive issue is whether the manner in which the product was used was reasonably foreseeable. Our holding does mean that if either or both of the parties in a strict liability design defect case utilize risk-utility evidence as their method of proof, a corresponding jury instruction must be given if requested.


(5)

Given our conclusion that the judgment must be vacated and the matter remanded for a new trial, it is not necessary for us to address the question of whether the award for loss of society was excessive.


CONCLUSION

In sum, we hold that both the consumer-expectation test and the risk-utility test may be utilized in a strict liability design defect case to prove that the product is "unreasonably dangerous." Whether an instruction is required on either test or both tests will depend on the issues raised in the pleadings and the evidence presented at trial. When both tests are employed, consumer expectation is to be treated as one factor in the multifactor risk-utility analysis.

Because the trial court abused its discretion by refusing the tendered nonpattern instructions, the judgment of the appellate court, which affirmed in part and reversed in part the judgment of the circuit court, is reversed, the judgment of the circuit court is reversed, and the cause is remanded to the circuit court for a new trial.

*Appellate court judgment reversed;*
*circuit court judgment reversed;*
*cause remanded.*

JUSTICE KILBRIDE took no part in the consideration or decision of this case.

CHIEF JUSTICE FITZGERALD, concurring in part and dissenting in part:

While I agree with the majority opinion in parts (1), (2), and (4)(a) and (b), I depart from the majority's conclusion in sections (3) and (4)(c), particularly to the extent that it can be read to approve defendants' tendered non-IPI instructions. Because I am not persuaded that defendants' non-IPI instructions were superior to plaintiff's approved IPI instructions in guiding the jury's consideration of the issues in this case, I do not believe the trial court abused its discretion. Instead, I believe the IPI instructions–along with the arguments of counsel based upon the evidence presented–provided an adequate framework to allow the members of the jury to reach the ultimate issue. Therefore, I depart from the majority because I cannot find that the jury was clearly misled or that the defendant was prejudiced. My basis for that opinion rests largely upon matters in the record not addressed by the majority's opinion, namely, the arguments of counsel and the faultiness of defendants' instructions.

As required by Illinois Pattern Jury Instructions, Civil, No. 400.06 (2006), the trial court gave the jury an instruction requiring it to find in favor of plaintiffs on a strict liability theory if, *inter alia*, the seat was "unreasonably dangerous" in the sense that it was "unsafe when put to a use that is reasonably foreseeable considering the nature and function" of the seat. IPI Civil (2006) No. 400.06. In contrast, Ford's issues and burden instructions submitted to the court stated that the issue was whether "the design defect made the Escort unreasonably dangerous" and that "on balance the benefits of the 1996 Escort's front seat design outweigh the risks of danger inherent in the design." Defendants' definition instruction No. 27 stated, in part,

> "[A] product is defective in design when the foreseeable risks of harm posed by the product outweigh the benefits of the design and the risks can be reduced or avoided by the adoption of an alternative feasible design. Feasibility includes not only elements of economy, effectiveness and practicality, but also technological possibilities under the state of manufacturing art at the time the product was produced."

Defendants' definition instruction No. 28 stated,

> "[W]hen evaluating the reasonableness of a design alternative, the overall safety of the product must be considered. It is not sufficient that the alternative design would have reduced or prevented the harm suffered by the plaintiff if it would also have introduced into the product other dangers of equal or greater magnitude. A product's design may be reasonably safe even if the product is not accident proof."

Both plaintiff's and defendants' instructions must be evaluated to determine whether the trial court abused its discretion.

Illinois Supreme Court Rule 239(a) governs the choosing of instructions and provides that the court should consider the facts and law and "shall" use the IPI unless it determines that it does not accurately state the law. 177 Ill. 2d R. 239(a). A reviewing court will reverse a trial court's determination about which instruction to give upon an abuse of discretion. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). We will examine the jury instructions in their entirety, to determine whether they fairly,

-43-

fully and comprehensively informed the jury of the relevant law. *Schultz*, 201 Ill. 2d at 273-74. Ordinarily, we will not reverse a trial court, even if the trial court gave faulty instructions, unless the instructions clearly misled the jury and resulted in prejudice to the appellant. *Schultz*, 201 Ill. 2d at 274; *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 507 (2002).

Our jurisprudence recognizes counsel has some role to play in helping the jury to understand the instructions given by the judge. As is stated in the foreward to the first edition of the Illinois Pattern Jury Instructions, Civil, "on many occasions when the Committee has rejected an instruction it has felt not so much that the point ought not to be told to the jury, but rather it should be told to the jury by *counsel* rather than by the Court." (Emphasis in original.) See IPI Civil (2006), at xxii (foreward to the first edition). This court echoed that idea in *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260 (2002). In *Schultz*, the court concluded that the trial court erred in giving an IPI instruction. *Schultz*, 201 Ill. 2d at 281. Nevertheless, the court held that the trial court's failure to properly instruct the jury was not reversible error and noted the appellate court's judgment may be affirmed on any basis in the record. *Schultz*, 201 Ill. 2d at 281. We found that it was not clear from the record that the jury was misled by the error. *Schultz*, 201 Ill. 2d at 281. We noted that the trial court allowed defense counsel to discuss in closing argument evidence regarding defendant's rejected instruction, and noted that defense counsel did so, emphasizing that evidence in the framework of the instructions given by the court. *Schultz*, 201 Ill. 2d at 282.

This idea that the arguments can supplement the jury instruction is also found in *Carrillo v. Ford Motor Co.*, 325 Ill. App. 3d 955 (2001). As the majority notes, the *Carrillo* case involves nearly identical facts, the same lawyers, trial judge, and experts as the instant matter. More importantly, the instructions against Ford were identical in both trials: the court gave plaintiff's tendered IPI instruction nos. 400.01, 400.02 and 400.06 and refused to give defendant's instruction, IPI Civil No. 400.07. 325 Ill. App. 3d at 963-64. The court noted, however, that defense counsel's arguments were sufficient when it stated "IPI Civil (2000) No. 400.06 told the jury a product is unreasonably dangerous only when put to a use that is

reasonably foreseeable. [Citation.] *Ford was free to argue and did argue that Lydia's accident was of a rare type*. Both sides presented lengthy and conflicting testimony from a long list of experts. The jury made its decision." (Emphasis added.) *Carrillo*, 325 Ill. App. 3d at 965-66. Therefore, following *Carrillo*, the foreward to the first edition of the Illinois Pattern Jury Instructions, and *Schultz*, I find IPI Civil (2006) No. 400.06 can provide an adequate framework to deliver the appropriate legal guidance to the jury if counsel was permitted to make arguments pertaining to the rejected instruction.

Looking at the record, it is clear that counsel emphasized the risks and benefits of the CT20 seat. The majority recounted the extensive evidence submitted to the jury regarding the benefits and dangers of the CT20 seat, as well as Timberlake's role in the accident. The defense counsel was free to argue, and did argue extensively, that the "balance" of the risks of an alternate seat design outweighed the benefits such that the CT20 seat was not "unreasonably dangerous." I note also that defense counsel devoted some argument on the proximate cause issue to Timberlake's role as the potential sole proximate cause of the accident, as a drunk driver of a Cadillac speeding at 60 miles per hour into the back of a standing Ford Escort.

Based upon the use of IPI Civil (2006) Nos. 400.01, 400.02 and 400.06 and arguments from counsel, there is no indication that the jury was clearly misled and that defendants were prejudiced. *Schultz*, 201 Ill. 2d at 274. The general instruction contains nothing which would prevent the jury from considering the defense experts' testimony that a different seat design would have introduced a host of dangers. Certainly, if the jurors had credited the defense experts and discredited the plaintiff's experts, the jury had the proper legal framework to find that seat was allowably dangerous–dangerous to some consumers like Mikolaczyck perhaps–but not *unreasonably* dangerous considering the nature and function of the seat in relation to all possible accidents that could occur.

Further, there is no indication that the jury could not make some form of a risk/benefit analysis in coming to its decision. That determination is not beyond the ken of the jury given adequate expert testimony. Indeed, it would be difficult to find that a jury conducted an adequate reasonableness analysis without simultaneously conducting a risk/benefit analysis. The jury could have concluded that

the risks of the current seat to James Mikolajczyck's life were not outweighed by the benefits of some other hypothetical lives that would have been saved. Whether it performed that balance correctly is beyond the purview of this opinion as it relates to a manifest weight of the evidence argument, which was not raised by the defense counsel before the appellate court or this court.

Turning to defendants' instructions, I believe that the trial court correctly rejected the non-IPI instructions. First, read as a whole, the conspicuous problem with the defendants' instructions is that they deny plaintiff her chosen method of proof: consumer expectations. Rather, it appears the defendants' strategy was the adoption of the risk-utility test as the sole test for products liability. In fact, defendant appears to have admitted as much to the appellate court (see 369 Ill. App. 3d 78, 87) and contains no argument before this court that the consumer expectations test should be retained. There was no basis in precedent for the trial court to force plaintiff to abandon her choice of the consumer expectations test.

I note also that defendants' instruction departs from the majority's possible formulation of the risk utility test (see slip op. at 30), which includes " 'the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing.' " (Emphasis omitted.) Slip op. at 30, quoting Restatement (Third) of Torts: Products Liability §2, Comment *f*, at 23 (1998). I agree with the majority that the "consumer expectation" test should not be abandoned. But I also note that the Third Restatement does not itself propose a jury instruction. Restatement (Third) of Torts: Products Liability §2, Comment *f*, at 25 ("This Restatement takes no position regarding the specifics of how a jury should be instructed. So long as jury instructions are generally consistent with the rule of law set forth in Subsection (b), their specific form and content are matters of local law"); Comment *f*, Illustration 6, at 25 (1998) ("Whether instructions to the trier of fact should include specific reference to these factors is beyond the scope of this Restatement and should be determined under local law") (1998).

Next, defendants' instructions contain an inaccurate statement of the law in their burden shifting language in instruction 19. The relevant portion of that instruction provides: "If you find from your

consideration of all the evidence that each of these propositions has been proved, then the burden shifts to Ford/Mazda to prove that on balance the benefits of the 1996 Escort's front seat design outweigh the risks inherent in the design." The burden of proof does not shift to Ford/Mazda. Rather, the ultimate burden remains with the plaintiff to prove that the car seat was unreasonably dangerous. The majority notes that no decision of this court has ever expressly adopted this burden-shifting formulation, and rejects that position in its opinion. Slip op. at 14-15.

Defendants' non-IPI instruction No. 28 was also problematic in that it, *inter alia*, provided "a product's design may be reasonably safe even if the product is not accident proof." I note that this language–"reasonably safe"–has not been approved in Illinois precedent, and the majority has rejected it for lack of clarity. Slip op. at 22 (noting that the phrase " 'not reasonably safe' might be interchangeable with 'unreasonably dangerous,' but that the 'Restatement, and *Suvada* and all its progeny, furnish persuasive authority that the jury should be instructed that it is the "unreasonably dangerous" condition of the product which leads to liability' "), quoting IPI Civil (2006) No. 400.01, Comment, at 553. As the majority notes, this language amounts to adoption of section 2(b) of the Restatement (Third) and would necessarily overrule *Lamkin*, *Hansen*, and *Calles*. Slip op. at 22. Furthermore, the words "not accident proof" are argumentative in that they have no source in Illinois law, according to my research, and could render any product not "unreasonably dangerous," as every product can meet the standard of not being accident proof.

As such, the trial judge faced the possibility that the jury would have been misled and the plaintiff would have been prejudiced had defendants' instructions been used. Therefore, had the trial judge been dissatisfied with plaintiff's IPI instructions, the defendants' non-IPI instructions would have presented greater difficulties in giving the jury an accurate statement of the law.

Lastly, I find *Dillon* distinguishable. In *Dillon*, we held that the jury instructions on damages including the phrase "the increased risk of future injuries" failed to instruct the jury properly. The holding in *Dillon* was at odds with this court's historical rejection of recovery for risk of future injuries. *Dillon*, 199 Ill. 2d at 497. There also was a

split of authority in the appellate court. *Dillon*, 199 Ill. 2d at 498. Having determined for the first time that the element of damages was compensable, the court then turned to whether the jury instruction was proper. *Dillon*, 199 Ill. 2d at 504. This court did not address the supplementation of the jury instructions with adversarial emphasis during argument. Further, we deemed the instruction faulty because it failed to distinctly instruct the jury regarding the amount of possible future damage multiplied by the probability that it would occur. *Dillon*, 199 Ill. 2d at 507. There was no indication in *Dillon* that this was supplemented by the arguments of counsel. Here, this court had not spoken on this specific issue, there was no split in authority in the appellate court, and the parties were able to supply adversarial emphasis. I therefore cannot find that the trial court abused its discretion as the jury was not clearly misled and the defendants were not prejudiced by the use of the IPI instruction.

I therefore depart from sections 3 and 4(c) of the majority opinion as those sections rest on the assumption that defendants' instruction were superior to plaintiff's instructions and fail to consider the effect of defense counsel's argument. See slip op. at 25-26 (stating the trial judge "may not unilaterally preclude the giving of a jury instruction that presents the defendant's theory of the case, so long as the defendant's instructions accurately state the law and is supported by the evidence. Assuming, for now, that defendants' tendered instructions met these criteria, we consider the implications of giving a jury both consumer-expectation and risk-utility instructions in a design defect case"). Accordingly, I believe that the trial court did not abuse its discretion in choosing plaintiff's IPI instructions over defendants' non-IPI instructions. I therefore respectfully dissent.

## Dissent Upon Denial of Rehearing

CHIEF JUSTICE FITZGERALD, dissenting:

Among plaintiff's arguments on rehearing under Supreme Court Rule 367(b) (210 Ill. 2d R. 367(b)) are that the court "overlooked or misapprehended" the faultiness of the defendants' instructions and the majority silently overruled prior precedent of this court as found in *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247 (2007), *Hansen v.*

*Baxter Healthcare Corp.*, 198 Ill. 2d 420 (2002), and *Lamkin v. Towner*, 138 Ill. 2d 510 (1990). I agree with these points and additionally find that they are not reargument of the case. I therefore respectfully dissent upon denial of rehearing.

Plaintiff first asserts that defendants' alternate instructions misstated the law in seven respects, including some of those I noted in my dissent. Defendants' instructions improperly: (1) required plaintiff to prove there was an alternative feasible design in existence at the time defendant sold the product in order to impose liability; (2) misstated the law for proving risk-utility in that they stated that the burden shifts to defendants to prove that the benefits of the design outweighs its risks; (3) failed to correctly state the majority's "integrated test" because defendants' instructions did not include any reference to consumer expectation; (4) required the plaintiff to prove the product was "unreasonably dangerous" without a definition of the phrase; (5) required the plaintiff to prove both that the vehicle had a "design defect" and the vehicle was "unreasonably dangerous"; (6) used the phrase "not reasonably safe," which this court rejected as an inadequate substitute for "unreasonably dangerous"; and (7) contained an argumentative reference to a product being reasonably safe even if it is not "accident proof." I note that these liability instructions were the topic of extensive discussion before and during the trial. Therefore, unaddressed by the majority opinion is the trial court's consideration of whether plaintiff would have suffered serious prejudice had the trial court opted for defendants' instructions. A principal result of this omission is that the majority opinion can be read as approving defendants' instructions. For that reason alone, plaintiffs have presented a strong case to grant rehearing in order to remove this court's possible imprimatur on defendants' instructions.

The failure to examine defendants' instructions also leads to a misapprehension of the extent the trial court's decision allowed for a fair, although imperfect, trial for both parties. The trial court used IPI instructions that generally, although not specifically (see *Hansen v. Baxter Healthcare Corp.*, 309 Ill. App. 3d 869, 884 (1999); see also slip op. at 8), provided for consideration of risk-utility evidence by the jury. The trial court allowed defendants to argue risk utility to the jury. As I stated in my dissent, shortcomings within the jury instructions may be remedied in closing argument. See slip op. at 44

-49-

(Fitzgerald, C.J., concurring in part and dissenting in part) (citing *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260 (2002), *Carrillo v. Ford Motor Co.*, 325 Ill. App. 3d 955 (2001), and IPI Civil (2006), at xxii (foreward to the first edition)). I also believe that rehearing should be granted to consider the role that argument to the jury could have lessened or removed any possible prejudice to defendant.

Plaintiff next claims that the majority opinion departed from this court's decision in *Deal v. Byford*, 127 Ill. 2d 192, 202-03 (1989). Under *Deal*, a party claiming error in instructions must submit "a correct instruction" stating the law for which he argues on appeal to avoid waiver. *Deal*, 127 Ill. 2d at 202, citing 107 Ill. 2d R. 239(b). Here, defendants' instructions were not "correct" by reason of the errors listed above. Left unanswered by the majority opinion is the role of the trial court when submitted incorrect instructions which would have prejudiced the opposing party. Importantly, plaintiff suggests that she may not have objected had the trial court given a neutral instruction such as:

> "When I use the expression 'unreasonably dangerous,' I mean that the risk of danger inherent in the design outweighs the benefits of the design when the product is put to a use that is reasonably foreseeable considering the nature and function of the product."

Thus, the majority decision may have been entirely different if defendants had additionally offered such an "integrated" instruction to the trial court instead of attempting to submit fatally flawed instructions which denied plaintiff's theory of the case, namely, consumer expectation. Therefore, I believe a proper examination of defendants' instructions must also include discussion of whether defendant properly submitted a "correct" instruction under *Deal* and what role the submission of an incorrect instruction played into the trial court's exercise of discretion.[2]

---

[2]Plaintiff makes a similar argument concerning *Dillon v. Evanston Hospital*, 199 Ill. 2d 483 (2002). However, I believe the debate over that case was adequately set forth in my dissent.

Plaintiff next argues that the majority's adoption of the "integrated test" ignores this court's past precedent allowing a plaintiff to prove strict liability under alternate theories of liability, *i.e.*, the consumer-expectation theory and the risk-utility theory. I note that, in general, a plaintiff is entitled to jury instructions embodying her theory of the case. *Snelson v. Kamm*, 204 Ill. 2d 1, 27-28 (2003); *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 406-07, 414-15 (1998). Similarly, the majority held that a party has the right to have the jury instructed on each theory supported by the evidence and referred to decisions of this court over the past two decades. Slip op. at 26 (citing *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247 (2007), *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420 (2002), and *Lamkin v. Towner*, 138 Ill. 2d 510, 529 (1990)). Here, plaintiff tendered consumer-expectation instructions and, since the evidence supported that claim, the trial court was required to instruct the jury on her theory.

The majority, however, held that the trial court abused its discretion in giving the IPI instructions that properly set forth plaintiff's theory of the case. Therefore, as the plaintiff correctly points out, the majority's statement that the consumer-expectation test still exists as a separate theory is illusory. It also calls into question the holdings of *Lamkin*, *Hansen*, and *Calles* that a plaintiff may pursue her strict liability case either under the consumer-expectation test, the risk-utility test, or both.

This question arises from the incorrect assumption that defendants had a case to prove. Defendants had no case to prove; they had a case to defend. If there were affirmative defenses raised by the evidence, defendants would have been entitled to choose whether to ask for an instruction on any one or all of them. Here, I believe that the general instructions provided by the IPI along with defense counsel's argument specifically concerning risk-utility adequately provided a fair trial. Instead, the majority improperly erased all of the lines drawn in our decisions in *Calles*, *Hansen*, and *Lamkin* delineating a plaintiff's ability to choose between the consumer-expectation test and the risk-utility test.

In sum, we are left with the still unresolved question of the role of a trial judge when given a general IPI jury instruction on the one hand, and flawed jury instructions on the other. Because the majority

-51-

has "overlooked" the problem presented by defendants' badly flawed instructions, I believe the majority has arrived at a similarly badly flawed solution and rehearing is required under Rule 367(b) (210 Ill. 2d R. 367(b)). The majority's resolution of the jury instructions issue also leaves in doubt whether the consumer-expectation test remains a viable alternative and whether portions of *Lamkin*, *Hansen*, and *Calles* have been overruled. As a result, because I believe the majority wrongly found the trial court abused its discretion, I would reach the issue of remittitur. I therefore respectfully dissent upon denial of rehearing.