In the

# United States Court of Appeals

## For the Seventh Circuit

───────────────

No. 24-2865

REBEKAH HILLMAN, individually and as next friend of P.J.H., a minor, and JENNIFER HILLMAN,

*Plaintiffs-Appellants*,

*v.*

THE TORO COMPANY,

*Defendant-Appellee.*

───────────────

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:21-cv-04081-SLD-JEH — **Sara Darrow**, *Chief Judge*.

───────────────

ARGUED SEPTEMBER 11, 2025 — DECIDED JANUARY 21, 2026

───────────────

Before EASTERBROOK, HAMILTON, and MALDONADO, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Rebekah Hillman lost her left leg below the knee in a riding lawnmower accident. Rebekah, her wife Jennifer Hillman, and their minor daughter P.J.H. sued the manufacturer of the mower, The Toro Company, alleging that the mower's design was defective in several ways. According to the Hillmans, the mower should have had a

mechanical brake independent of the hydrostatic transmission or an interlock ignition system, either of which would have prevented the accident, and/or a rollover protection system for rider safety in the event of a crash.

The district court excluded all of the Hillmans' expert evidence as unreliable or irrelevant and therefore granted Toro summary judgment. The Hillmans have appealed, focusing on the exclusion of the expert testimony they offered. We affirm most of the district court's evidentiary rulings, but the district court did not directly address one expert's independent brake opinions. Those opinions are reliable and relevant, and the expert's qualifications are unchallenged. Those opinions raise genuine disputes of material facts on the independent brake theory. We therefore reverse the summary judgment for Toro on the strict products liability and negligent design theories based on the lack of an independent brake. We affirm in all other respects and remand for trial.

I.  *Factual and Procedural Background*

A.  *Zero-Radius-Turn Mowers*

We relate the facts in the light most favorable to the Hillmans as the non-moving parties. E.g., *Malen v. MTD Products, Inc.*, 628 F.3d 296, 303 (7th Cir. 2010). Zero-radius-turn mowers owe their distinctive maneuverability to the fact that the rear wheels operate independently of each other. That design allows the driver to pivot on a dime by manipulating separate control levers on each side of the mower. Each rear wheel is powered by a hydrostatic motor, which also provides the primary braking for the mower when the control levers are pulled to the center.

Defendant Toro manufactures a zero-radius-turn mower called the Toro ZRT Timecutter 5000. In 2014, the Hillmans purchased a Timecutter that had been designed and manufactured in 2013. In addition to the primary hydrostatic braking capacity, the Timecutter has an electric parking brake. The parking brake is designed to keep the mower stationary, including when stopped on an incline, but the parking brake is not strong enough to stop the mower when it is already in motion. The hydrostatic motors can be disengaged—thus disabling all hydrostatic braking capacity—when the operator inserts "bypass pins." Doing so essentially puts the rear wheels in neutral, which allows the mower to be pushed or towed, for example.

At the center of this appeal, the Hillmans' Timecutter did not have an independent brake that could stop the mower without relying on the hydrostatic motors. So if the mower began to move while the bypass pins were pushed in, it would have no brake strong enough to stop it. The Timecutter also lacked a rollover protection system, meaning a roll bar and seatbelt designed to keep the rider safe in the event of a rollover crash. The mower also lacked a safety interlock system that would have prevented the operator from starting the engine when the bypass pins were engaged and the hydrostatic braking was thus disabled.

B. *The Accident*

In June 2020, Rebekah Hillman was using her Timecutter to mow the Hillmans' lawn. The mower became stuck in a flower bed in the backyard. The backyard sloped gradually down from a treeline toward the house. The flower bed close to the house was much steeper. At the edge of the flower bed

closest to the house, a retaining wall formed a sharp six-foot drop onto a gravel bed.[1]

Jennifer came to help with the stuck mower. She disengaged the mower's rear wheels by pushing in the bypass pins so she could tow it back up the incline. After she had towed it, however, she did not pull the bypass pins back out. Rebekah got back on, started the engine, and pulled the motion control levers to resume mowing. This action did not engage the rear wheels because the bypass pins were still pushed in, but it did disengage the parking brake. The mower began rolling down the incline. Rebekah tried to use the levers to engage the electric parking brake, to no avail. The mower gained speed, gradually at first and then more quickly once it reached the steeper flower bed. At that point, Rebekah tried to jump clear of the mower onto the gravel below the retaining wall. She was unable to jump clear, and the mower landed on her legs. The fall and the impact of the mower striking her while she lay on the ground fractured her right knee and the bones in her left leg, which had to be amputated below the knee.

C. *This Lawsuit*

The Hillmans are citizens of Illinois, and Toro is a Delaware corporation with its principal place of business in Minnesota. The Hillmans sued in federal court in Illinois under diversity jurisdiction. 28 U.S.C. § 1332. The Hillmans sought damages for Rebekah's injuries and resulting injuries to

---

[1] We refer to the Hillmans by their first names to avoid confusion. The district court's opinion helpfully includes photographs that show the slopes at the time of the accident. *Hillman v. Toro Co.*, 2024 WL 4353032, at *4 (C.D. Ill. Sept. 30, 2024).

Jennifer and their daughter. The operative complaint raised theories of strict products liability, negligent design, negligent failure to warn, and breach of warranty. After discovery and exchanges of expert witness reports, Toro moved for summary judgment on all theories and to exclude the Hillmans' three expert witnesses. The Hillmans voluntarily dismissed the breach of warranty theory but opposed summary judgment on all other theories.

The district court granted Toro summary judgment on all remaining theories, first excluding all of the Hillmans' expert reports in their entirety as unreliable or irrelevant. The court then held that the strict products liability and negligent design theories failed as a matter of law without supporting expert evidence. The court also granted Toro summary judgment on the failure-to-warn theories. *Hillman v. Toro Co.*, 2024 WL 4353032 (C.D. Ill. Sept. 30, 2024).

## II. *Illinois Products Liability Law and Expert Evidence*

Illinois law governs this diversity action. To prevail on their strict products liability claims, the Hillmans must prove that a condition of the Timecutter attributable to Toro made it unreasonably dangerous at the time it left Toro's control and that the condition was a factual and proximate cause of Rebekah's (and thus Jennifer's and P.J.H.'s) injuries. *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 525–27, 901 N.E.2d 329, 335–36 (2008). Illinois recognizes three theories of strict products liability: manufacturing defects, design defects, and failures to warn. *Id.* at 548, 901 N.E.2d at 348.

Plaintiffs in a design defect case may use either or both of two methods of proof to show that the defect makes a product unreasonably dangerous. First, the consumer expectations

test asks "whether the product is unsafe when put to a use that is reasonably foreseeable considering its nature and function." *Id*. at 554, 901 N.E.2d at 352. Second, the risk-utility test asks whether "on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs." *Id.* at 526–27, 901 N.E.2d at 336, quoting *Lamkin v. Towner*, 138 Ill. 2d 510, 529, 563 N.E.2d 449, 457 (1990). Under the risk-utility test, "a plaintiff may prove a design defect by presenting evidence of 'the availability and feasibility of alternate designs at the time of its manufacture'" or non-compliance with design standards set by the industry, an authoritative voluntary association, or government regulations. *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 263–64, 864 N.E.2d 249, 260 (2007), quoting *Anderson v. Hyster Co.*, 74 Ill. 2d 364, 368, 385 N.E.2d 690, 692 (1979).

To prevail on their negligence theories, the Hillmans must prove that Toro breached a duty of care to them and that the breach was a proximate cause of their injuries. *Calles*, 224 Ill. 2d at 270, 864 N.E.2d at 263. "The key distinction between a negligence claim and a strict liability claim lies in the concept of fault. In a strict liability claim, the focus is on the condition of the product. However, in a negligence claim, a defendant's fault is at issue in addition to the condition of the product." *Id.* at 270, 864 N.E.2d at 263–64 (citations omitted).

Illinois intermediate appellate courts require expert testimony in design defect cases involving "specialized knowledge or expertise outside the layman's knowledge." *Baltus v. Weaver Division of Kidde & Co.*, 199 Ill. App. 3d 821, 834, 557 N.E.2d 580, 588 (1990); *Henry v. Panasonic Factory Automation Co.*, 396 Ill. App. 3d 321, 326, 917 N.E.2d 1086, 1091–92 (2009) (same). We have no reason to expect the Illinois

Supreme Court would disagree with this widely accepted principle in product-liability law.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony in the federal courts, even in a diversity case controlled by state substantive law. *Stutzman v. CRST, Inc.*, 997 F.2d 291, 295 (7th Cir. 1993); accord, *Love v. United States*, 17 F.4th 753, 755–56 (7th Cir. 2021) (Rule 702 governed admission of expert evidence in federal tort claim case governed by state substantive law). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The district court plays a crucial role as "evidentiary gatekeeper," admitting expert evidence only after evaluating: "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's

testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778–79 (7th Cir. 2017), quoting *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017), citing in turn *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Our opinions have identified long lists of potential factors for district courts to consider in addressing reliability, but those factors, we emphasize once again, are neither mandatory nor dispositive. See *id.* at 779–80. "Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999). We apply an abuse of discretion standard of review and "shall not disturb the district court's findings unless they are manifestly erroneous." *Anderson v. Raymond Corp.*, 61 F.4th 505, 508 (7th Cir. 2023), quoting *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607–08 (7th Cir. 2006).

To earn deference, however, the district court must show its work. See *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). We review de novo whether a district court has followed Rule 702's framework for evaluating expert evidence. *Anderson*, 61 F.4th at 508. Announcing that a particular expert opinion "simply does not pass the *Daubert* test" is "a conclusion—not an analysis—to which we owe no deference." *Id.* at 508–09. Our threshold review is not exacting, but it is granular. Where an expert report contains multiple opinions, deference is due only for the district court's decisions on the opinions it satisfactorily addresses. See *Gayton*, 593 F.3d at 616–18 (separately addressing three excluded opinions by same expert; affirming exclusion of one but reversing on two others, including one the district court did not address at all).

III. *Analysis*

We find no reason to disturb most of the district court's exclusions of the Hillmans' expert witnesses' opinions. The district court satisfactorily addressed the reports by Kelly Kennett and David Bilek, and much of Thomas Berry's report. The court explained specifically why, in its view, most of the opinions it excluded were unreliable, irrelevant, or both. See *Hillman v. Toro Co.*, 2024 WL 4353032. The court's express findings on relevance and reliability were not manifestly erroneous. The problem, however, is that the district court did not address the portion of Berry's report explaining the need for an independent brake. We consider de novo the admissibility of his opinion on that question. The opinion is relevant and reliable, and Toro has not questioned Berry's qualifications. He holds a master's degree in mechanical engineering and has been a licensed professional engineer for decades. We conclude that his independent brake opinions are admissible under Rule 702 and establish genuine disputes of material fact that preclude summary judgment on the Hillmans' strict products liability and negligent design theories based on the lack of an independent brake.[2]

A. *Kelly Kennett*

Kennett offered two opinions: (1) an independent brake would have prevented the accident entirely; and (2) a rollover protection system would have mitigated Rebekah's injuries. The district court excluded the first opinion as "too obvious."

_____

[2] The Hillmans waived their failure-to-warn theory by choosing not to address the district court's reasoning. *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023). We thus do not address the portions of the expert opinions related to that theory.

The court excluded the second as unreliable because Kennett had no testing data on how a rollover protection system performs in a "forward pitch-over event." The district court noted as well that the second opinion was unhelpful because Kennett opined on rollover protection systems generally and not on any particular form. We find no error in this reasoning.[3]

B. *David Bilek*

Bilek offered three opinions: (1) an independent brake would have prevented the accident entirely, and its absence made the Timecutter defective and unreasonably dangerous; (2) a safety interlock would have prevented the accident entirely; and (3) the Timecutter was defective and unreasonably dangerous without a rollover protection system. The district court excluded the first because the causation opinion (like Kennett's) was too obvious and because he conducted no testing on an independent brake. The court excluded the second opinion on a safety interlock as too obvious and excluded the third also because Bilek conducted no testing on how a rollover protection system would have prevented Rebekah's injuries. Though we might not necessarily agree with all of this

---

[3] Kennett's report also discussed the mechanism of Rebekah's injury. The district court did not separately address that section, and under *Anderson* we cannot give deference based on its statement that "Kennett's opinions [in their entirety, presumably] do not pass muster under *Daubert* and Federal Rule of Evidence 702 and cannot be used to oppose summary judgment." *Anderson v. Raymond Corp.*, 61 F.4th 505, 508–09 (7th Cir. 2023). To the extent the precise mechanism of Rebekah's injury is relevant on remand to the independent brake theory (which it may not be), we reverse the exclusion of that portion of his report. See *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010).

analysis if we had to consider Bilek's report in the first instance—we explain below why portions of Berry's report are admissible even though he too conducted no testing—the deferential standard of review matters. We find no manifest errors here either.[4]

C. *Thomas Berry*

Berry offered two opinions: (1) the Timecutter was defective and unreasonably dangerous because it lacked an independent service brake, which would have prevented the

---

[4] Bilek's report also offered an accident reconstruction, which the district court provided no reason to doubt and even relied on in its own recitation of the facts. To the extent that the accident reconstruction is relevant to the independent brake claims—which it may be if Toro contests whether Rebekah would have had the time and distance to use an independent brake if one had been present—the Hillmans are entitled to rely on that portion of Bilek's report. See *Gayton*, 593 F.3d at 618.

As to Bilek's third opinion, on the lack of a rollover protection system, the district court also wrote: "Whether the Subject Mower is unreasonably dangerous and therefore defective is a legal conclusion and again, 'experts may not testify as to legal conclusions that will determine the outcome of the case.'" 2024 WL 4353032, at *14, quoting *Marquis ProCap Sys. v. Novozymes North America, Inc.*, No. 20-1020, 2023 WL 3775173, at *2 (C.D. Ill. June 2, 2023) (Mihm, J.). That analysis was incorrect. The case on which *Marquis* relied concerned expert testimony that was "largely on purely legal matters," namely whether the city's actions violated a federal statute. *Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Judges do not need expert testimony to interpret and apply domestic statutes. See *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) ("The only legal expert in a federal courtroom is the judge."). Whether a product is unreasonably dangerous is not a purely legal question. Also, the former rule that a witness cannot testify on an ultimate issue no longer applies in federal civil cases. Fed. R. Evid. 704(a); *Walker v. Soo Line Railroad Co.*, 208 F.3d 581, 587 n.2 (7th Cir. 2000).

accident entirely; and (2) the Timecutter was defective and unreasonably dangerous because it lacked a rollover protection system, which would have mitigated Rebekah's injuries. The district court excluded the second opinion because Berry offered no testing data on rollover protection systems in forward longitudinal rollovers, as opposed to lateral or backward longitudinal rollovers, and so he failed to "apply his expertise to the specific facts of this case." The district court concluded that "Berry's opinions do not satisfy the reliability standards of *Daubert* and Federal Rule of Evidence 702" and excluded them. We find no manifest errors in the district court's analysis of Berry's opinions on the rollover protection system.[5]

Absent from the district court's discussion of Berry's report, however, is any analysis of his opinion on the lack of an independent brake. The conclusory statement that his opinions "do not satisfy the reliability standards of *Daubert* and [Rule 702]" is not enough to warrant deference. *Anderson*, 61 F.4th at 508–09. So we consider de novo the admissibility of Berry's opinions on the lack of an independent brake.

### 1.  *Berry's Independent Brake Opinions Pass Muster*

Berry's opinions on an independent brake are admissible under Rule 702 because they are both relevant and reliable. Berry's opinions are relevant both to the risk-utility test that governs the strict liability theory and to whether Toro breached its duty of care to the Hillmans in designing the

---

[5] Berry also opined on the lack of an ignition safety interlock, which the district court did not mention at all, but as with the failure-to-warn theories, the Hillmans have waived it by not pursuing that point on appeal. See *Bradley*, 59 F.4th at 897.

Timecutter, part of the negligent design theory. Specifically, Berry opined that the Timecutter's lack of an independent brake made it "defective in design and unreasonably dangerous," and also that Toro "knew or should have known of technically and economically feasible design alternatives that would have significantly reduced the risk without adversely affecting the utility of the machine." Berry identified several such alternatives. He reported that at least one other zero-radius-turn mower manufactured by Toro had an independent brake. He also reported that Hydro-Gear, the company that made the hydrostatic motor used in the Timecutter, "had available a disc brake design that could have been utilized." Berry also identified two other zero-radius-turn mowers with independent brakes. One was a John Deere model with a "simple park brake" that "uses a lever to rotate two steel pawls against the rear tires" and withstands slopes of up to 30 degrees—greater than three times the slope of the Hillmans' lawn, at 9.5 degrees. He also identified a "more sophisticated brake system … such as that provided by Scag on its Patriot and Freedom Z mower," the latter being "only slightly bigger than the Toro Timecutter."

As for reliability, Berry cited several industry publications and patents to support and explain the need for an independent brake. He quoted a report given to the American Society of Agricultural Engineers as follows:

> For descending slopes, the hydrostatic transmission will provide some braking torque to the wheels due to the retarding characteristic of the engine. This is a transmission characteristic called "dynamic braking". *This braking capability does not eliminate the need for a service brake*. Some

> type of service brake must be included in the vehicle design to aid dynamic braking or for use in case of transmission failure. *Hydrostatic braking must not be considered as the primary braking device for vehicles at static conditions either with the engine running or the engine off….*

(Emphasis added.) Berry also quoted a Hydro-Gear patent stating that a "completely open hydraulic circuit"—as the Timecutter was once Jennifer pushed in the bypass pins—"can lead to uncontrolled free-wheeling of the vehicle and create significant safety risks."

Berry also quoted a report from the Fluid Power Safety Institute explaining a point that may be particularly important here because of the human error of failing to pull out the bypass pins. The report explained that operator error is not the only scenario for which an independent brake is essential. The report explained that a loss of hydrostatic braking capacity could be caused in several ways, including unexpected loss of a transmission line due to wear, wear in the motor, valve failure, and loss of oil in the reservoir. As the Institute put it: "There are simply too many things that can go wrong."

Toro has not offered a sound reason to exclude Berry's independent brake opinions as irrelevant or unreliable. Toro points out correctly that Berry never tested his alternative designs with independent brakes. And of course, testing of alternative designs can be an important factor in evaluating the reliability of proposed expert testimony. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742–43 (7th Cir. 2007), quoting *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001). While "hands-on testing" can help support an expert opinion, it is

not always "an absolute prerequisite" for admission. *Cummins v. Lyle Industries*, 93 F.3d 362, 369 (7th Cir. 1996); see also *Baley v. Federal Signal Corp.*, 2012 IL App (1st) 093312, ¶ 81, 982 N.E.2d 776, 796 (2012) (same under Illinois law).

Berry did not dream up new and untested designs. He relied instead on products that were on the market at the relevant time, including other zero-radius-turn mowers offered by Toro itself, as well as components offered by the manufacturer of the hydrostatic motor that Toro used in the Timecutter. He also relied on zero-radius-turn mowers offered by other companies that included independent brakes. Berry's alternative designs were taken from comparable products actually on the market. We can reasonably infer that those mowers with independent brakes were commercially and technically practical. We see no reason to treat Berry's alternative designs as based on speculation that required him to carry out tests before he could offer his opinion in court. Moreover, recall that the district court excluded Kennett's and Bilek's opinions on causation as so obvious as not to be helpful. Such an obvious point did not require experimental confirmation under these circumstances.

### 2. *Genuine Disputes of Material Facts*

Toro offers other arguments on the independent brake theory. They are not objections to the admissibility of Berry's expert testimony but instead alternative reasons to affirm summary judgment on the independent brake theory. The district court did not reach these other arguments, but they do not persuade us to affirm on alternate grounds.

First, Toro argues that the primary cause of Rebekah's injuries was Jennifer's failure to pull out the bypass pins, not a failure of the hydrostatic system. In its motion for summary judgment, Toro labeled this contention as a proximate cause issue, arguing that the omission of an independent brake "merely furnished the condition … by which Rebekah's injury was made possible" through Rebekah's and Jennifer's own "independent acts." However, because the Hillmans are the plaintiffs in this case, not third parties (nor third-party defendants), that argument is better treated as getting to comparative fault. See *Abrams v. City of Chicago*, 211 Ill. 2d 251, 259, 811 N.E.2d 670, 675 (2004) ("If the negligence charged does nothing more than furnish a condition by the which the injury is made possible, and that condition causes an injury by the subsequent, independent act *of a third person*, the creation of the condition is not the proximate cause of the injury." (emphasis added)); see also *Walker v. Macy's Merchandising Group, Inc.*, 288 F. Supp. 3d 840, 857 (N.D. Ill. 2017) (applying *Abrams* to case involving burn victim's suit against two distinct clothing manufacturers). Illinois follows a modified comparative fault regime for both negligent design and strict products liability theories. 735 Ill. Comp. Stat. 5/2-1116 (2025). A genuine dispute exists as to whether Rebekah or Jennifer acted negligently at all, and if so, whether they were more than fifty percent at fault for the accident. Here, arguments about comparative fault are appropriate for a jury but not a foundation for summary judgment.

Second, Toro argues factual causation, pointing out that the Hillmans' experts conducted no tests establishing that an independent brake would have prevented the accident. This argument is odd, and certainly not persuasive, given the district court's exclusion of Kennett's and Bilek's causation

opinions on the lack of an independent brake as "too obvi-ous." Berry's report said that the "simple" independent brake on one of John Deere's zero-radius-turn mowers is effective at slopes of up to 30 degrees, over three times as steep as the slope of the Hillmans' yard. A jury could infer from the fact that Rebekah had enough time to try to engage the electric parking brake that she could have tried to engage an inde-pendent brake instead, or as well. Perhaps Toro may be able to offer evidence that an independent brake would not have stopped the mower or slowed it enough to mitigate Rebekah's injuries, or that Rebekah would have had neither the time nor the wherewithal to use one. We cannot say, however, that there is no genuine dispute of fact on factual causation.

Third, Toro argues that Jennifer's failure to disengage the bypass pins distinguishes this accident from every other loss-of-control incident involving the Timecutter going back to at least 2005, the time limit for discovery in this case. Toro sug-gests the apparent uniqueness of this accident means no jury could find the benefits of adding an independent brake out-weighed the costs of doing so. But an independent brake would allow the Timecutter to stop when it loses hydrostatic braking capacity for *any* reason, not just an operator's error in failing to reset the bypass pins. "There are simply too many things that can go wrong," as the Fluid Power Safety Institute warned. The record of loss-of-control incidents involving the Timecutter since 2005 supports that claim. Neither party has quantified the cost per machine. Berry described the needed system as "simple" and one that was available in other prod-ucts on the market at the relevant time. An expert witness for Toro countered that adding an independent brake would be "adding unnecessary cost," but he did not specify that cost.

On this record, the cost-justification of an independent brake remains in genuine dispute.

Finally, Toro argues that the Timecutter's hydrostatic braking system complies with the applicable standard for zero-radius-turn mowers set by the American National Standards Institute, the "central organization that develops and accredits industry standards" for products in the United States. *Lemmermann v. Blue Cross Blue Shield of Wisconsin*, 713 F. Supp. 2d 791, 801 (E.D. Wis. 2010). Under Illinois tort law, compliance with industry standards is a "factor to be considered in the balance" in a negligent design case, not an automatic defense to liability. *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶ 91, 955 N.E.2d 1138, 1156 (2011). Toro may make this point to a jury, but it does not establish the absence of a genuine dispute of material fact as to whether the lack of an independent brake was a defect.

We REVERSE judgment for Toro to the extent it was based on rejection of the Hillmans' independent brake theory. The case is REMANDED for further proceedings consistent with this opinion.